**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| EMESE SIMON, M.D., an individual; and FLORIDA REHABILITATION ASSOCIATES, PLLC, a Florida Limited Liability Company, | |
| Plaintiffs, | Civil Action No.: 8:12-cv-236 |
| v. | |
| HEALTHSOUTH OF SARASOTA LIMITED PARTNERSHIP, an Alabama limited partnership; HEALTHSOUTH REAL PROPERTY HOLDING, LLC, a Delaware Limited Liability Company; HEALTHSOUTH CORPORATION, a Delaware corporation, n/k/a ENCOMPASS HEALTH CORPORATION FLORIDA; and HEALTHSOUTH REHABILITATION, INC., a Florida corporation, | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

**I.     INTRODUCTION**

1.      This action originated as an action to recover treble damages and civil penalties in excess of $50 million on behalf of the United States of America arising from false statements and claims made or caused to be made by Defendants and Dr. Alexander DeJesus ("Dr. DeJesus") to the United States and its agents and intermediaries in violation of the False Claims Act, 31 U.S.C. § 3728 *et seq*. (the "FCA") and by Doctor Emese Simon, M.D., individually and as the sole manager of Florida Rehabilitation Associates, PLLC (collectively "Dr. Simon"), to recover damages arising from Defendants' and Dr. DeJesus' retaliatory and discriminatory actions against her. Defendants and Dr. DeJesus knowingly made, used or caused to be made or used false records and statements material to false or fraudulent claims for payment in connection with

1

therapy and rehabilitative services. When Dr. Simon reported, objected to, or refused to participate in Defendants' and Dr. DeJesus' fraudulent practices, Defendants and Dr. DeJesus retaliated against and constructively discharged her.

2.      After an extensive investigation that lasted several years, on June 28, 2019, Defendants reached a settlement agreement with the United States Department of Justice whereby they agreed to pay $48 million to resolve allegations they made false claims for Medicare reimbursement based on, among other things, inaccurate diagnoses; medically unnecessary procedures, consultations, and admissions; misclassified therapy sessions; inflated hours; and other fraudulent billing and document practices.

3.      To effectuate this settlement, the United States Government filed an Unopposed Motion to Intervene For Purposes of Settlement in this case and two others.  These motions were granted by the Court on June 27, 2019.

4.      Pursuant to the settlement agreement and this Court's June 27, 2019 Order, the Government and Dr. Simon (as an individual) filed a Joint Stipulation of Dismissal on July 2, 2019 in which, *inter alia*, Dr. Simon agreed to the dismissal of only her Federal *qui tam* claims pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") against Defendants, preserving her retaliation claims pursuant to 31 U.S.C. § 3730(h), as well as her claims for attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d) which Defendants refused to address as part of the overall settlement with the Government.[1]  The Court entered an Order approving the Stipulation of Dismissal on July 3, 2019.  As a reward for the successful prosecution and resolution of Dr. Simon's (as an individual) *qui tam* claims, the Government

---

[1] As a prevailing plaintiff, Relator Simon is entitled to the payment of her attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d).  However, as of the date of this filing, Defendants have not yet agreed to pay such fees.

agreed to pay the Relators from the other two intervened cases and Dr. Simon (as an individual) a relator's share from the settlement proceeds. That payment will be forthcoming in the next several weeks. The various States that are still negotiating a settlement agreement with Defendants have also agreed to pay Dr. Simon (as an individual) and the other two Relators the same Relators' Share percentage as was paid by the Government.

5.      On July 3, 2019, as a result of a partial settlement agreement, this Court partially dismissed the action but retained jurisdiction over Dr. Simon's claims under 31 U.S.C. § 3730(h).

6.      On July 10, 2019, this Court granted Dr. Simon's Motion for Leave to File a Second Amended Complaint.

## II.      PARTIES, JURISDICTION AND VENUE

7.      This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

8.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein took place at a health care facility located in the Middle District of Florida, and is also proper pursuant to 28 U.S.C. § 139l(b) and (c) because at all relevant times Defendants transacted business in the Middle District of Florida.

9.      Defendants, HealthSouth of Sarasota Limited Partnership, an Alabama limited partnership; its General Partner, HealthSouth Real Property Holding, LLC, a Delaware Limited Liability Company; its member, HealthSouth Corporation, a Delaware corporation, now known as Encompass Health Corporation Florida; and HealthSouth Rehabilitation, Inc., a Florida corporation (hereafter collectively "HealthSouth" or "Defendants"), provide in-patient and, from 2005 to 2009, out-patient, therapy and rehabilitative services at their hospital located at 6400

Edge Lake Drive, Sarasota, Florida 34240 ("HealthSouth's Hospital").

10.     Sarasota Rehab Associates, Inc., a Florida corporation, provides the services of its sole officer and director, Dr. DeJesus, to HealthSouth, where he is the Hospital's Medical Director.

11.     Florida Rehabilitation Associates, PLLC is a Florida professional limited liability company which is wholly owned and operated by Dr. Simon (indivdually). At all times relevant to this matter, Florida Rehabilitation Associates, PLLC has been authorized to do business in Florida.

12.     Dr. Simon was, from 2006 to 2012, a Medical Director with HealthSouth and was an "Admitting Staff Member" at HealthSouth's Hospital. She served as HealthSouth's Director of the Spinal Cord Injury Program and as the Chair of its Pharmaceuticals and Therapeutics Committee. She also served as HealthSouth's Hospital Chief of Staff in 2008. She is a Fellow of the American Academy of Physical Medicine and Rehabilitation and Board Certified in Physical Medicine and Rehabilitation.

13.     Dr. Simon was retaliated against by HealthSouth beginning in or around March 2008 and thereafter, because she objected to, refused to participate in, and threatened to report to the government HealthSouth's violations of the FCA, resulting in her constructive discharge from the hospital in April, 2012.

## III.     FACTUAL BACKGROUND

### A.     MEDICARE AND MEDICAID PROGRAM REQUIREMENTS

14.     Therapy and rehabilitative care is an approach to help individuals who are healthy enough for a meaningful recovery and have a reasonable life expectancy.

15.     Therapy and rehabilitative services are provided by HealthSouth's Hospital,

4

which is an In-Patient Rehabilitation Facility (IRF).

16.     In 1965, Congress enacted Title XVIII of the Social Security Act to pay for the cost of certain medical services for persons aged 65 and older, certain persons with disabilities and persons with kidney failure.

17.     The U.S. Department of Health and Human Services ("HHS") administers the Supplementary Medical Insurance Program for the Aged and Disabled ("Medicare") through the Centers for Medicare & Medicaid Services ("CMS"), a division of HHS formerly known as the Health Care Financing Administration ("HCFA").

18.     The Medicare program has four parts, two of which are pertinent here: Medicare Part A ("Hospital Insurance Program"), which provides for care in or by institutional providers, *see* 42 U.S.C. § 1395c, *et seq.*; and Medicare Part B ("Supplemental Medical Insurance Program"), which pays for physician services and a variety of outpatient services, such as therapy and rehabilitative care. *See* 42 U.S.C. § 1395j, *et seq.*

19.     In order to participate in the Medicare program, a health care provider must meet the applicable qualifications and enroll in the Medicare Program.

20.     Under Medicare regulations, the term "Provider" means "a hospital, a critical access hospital, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare, or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services, or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services." 42 CFR § 400.202. HealthSouth is a "Provider" under the Regulations.

21.     Providers such as HealthSouth must comply with the requirements of the

Medicare and Medicaid programs in order to be eligible to receive payments from these programs for rehabilitative services.

22.     Section 4421 of the Balanced Budget Act of 1997 (Public Law 105-33) modified how payment is made for IRF services by creating Section 1886(j) of the Social Security Act (the "SS Act"), which authorized the implementation of a per-discharge prospective payment system ("PPS") for inpatient rehabilitation hospitals and rehabilitation units of acute care hospitals, such as the IRF operated by HealthSouth.

23.     The amount of the PPS payment the IRF receives for each patient is based on the IRF Patient Assessment Instrument ("PAI"), which contains patients' clinical, demographic and other information, and classifies the patients into distinct groups based on clinical characteristics and expected resource needs. Separate payments are calculated for each group, including the application of case and facility level adjustments.

24.     The IRF PPS includes the following elements:

a.   *Rates*. As required by § 1886(j) of the SS Act, the federal rates reflect all costs of furnishing IRF services (routine, ancillary, and capital related) other than costs associated with operating approved educational activities as defined in 42 C.F.R. §§ 413.75 and 413.85, bad debts, and other costs not covered under the PPS.

b.   *Medical Conditions*. Since May 7, 2004, 42 C.F.R. § 412.29(b)(2) specifies 13 medical conditions that meet the classification criteria for payment under the IRF PPS. They include: stroke, burns, spinal cord injury, major multiple trauma, congenital deformity, amputation, fracture of femur (hip fracture), brain injury, and neurological disorders (including multiple sclerosis), motor neuron disease, polyneuropathy, muscular dystrophy and Parkinson's disease. The SS Act also

stipulated that the criteria for these specified comorbidities must continue to be used to determine eligibility.

c. *Compliance percentage.* Under 42 C.F.R. § 412.29(b)(l), the IRFs must maintain a minimum percentage of the facility's total in-patient population that meet at least one of the medical conditions listed in 42 C.F.R. § 41 2.29(b)(2), which is known as the "compliance threshold." As of July 1, 2005, the compliance threshold is set at 60%, which is now referred to as the "60% Rule."

d. *Reasonable and necessary criteria for determining the reasonableness of IRF claims.* Under 42 C.F.R. § 412.622, effective for discharges that occur on or after January 1, 2010, claims for reasonable and necessary services are assessed under criteria which includes the key decision points considered and documented when making a decision to admit, retain or discharge an IRF patient; certain preadmission assessment requirements; a post-admission physician evaluation to verify that the beneficiary's preadmission assessment information remains unchanged or to document any changes; and specific requirements for an individualized overall plan of care for each individual.

25.   Among the criteria for determining the reimbursement for admission into the IRF and for the provision of reasonable and necessary therapy and rehabilitative services under 42 § 12.622(3), the IRF must determine that a beneficiary:

a. Needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs, one of which must be physical or occupational therapy;

b. Requires, and can actively participate and benefit from, an intensive rehabilitation therapy program generally consisting of at least 3 hours of therapy per day at least

5 days per week;

    c.   Is sufficiently medically stable at the time of admission to be able to actively participate in the intensive rehabilitation therapy program and benefit from IRF services; and

    d.   Requires close medical supervision by a licensed physician, including face-to-face visits with the patient at least 3 days per week, for the management of medical conditions to support participation in an intensive rehabilitation therapy program.

26.    Patients should only be admitted when they meet the criteria specified in the previous paragraph. When patients are improperly admitted because they do not meet the criteria, and the criteria are falsified in order to qualify for payment of a claim, any such falsification for admission is a precursor to a false claim, and all requests for payment for such patients are false claims under the FCA.

### B.   FALSE CLAIMS ACT

27.    Federal law prohibits knowingly presenting or causing to be presented a false or fraudulent claim for payment from the United States Government. It is unlawful to conspire to defraud the Government by getting a false or fraudulent claim allowed or paid.

28.    The FCA, at § 3729, provides in pertinent part that:

(a)    Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United states Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; ... or (4) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

                          ***

*is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the*

*Government sustains because of the act of that person*
\*\*\*

(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person without respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. §3729.

29.    On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which amended 31 U.S.C. § 3729(a)(l) and (a)(2), which became § 3729(a)(l)(A) and (a)(l)(B), respectively. After the FERA amendments, § 3729(a)(l) currently provides liability for any person who:

   a.   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

   b.   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or,

   c.   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); § 3729(a)(l).

30.    Under the FERA amendments, liability under§ 3729(a)(l)(A) or (C) applies to all conduct by HealthSouth and Dr. DeJesus which occurred after the date of the FERA enactment, May 20, 2009. For liability for false claims under § 3729(a)(l)(B), FERA provides that this provision applies retroactively to all false claims made by HealthSouth and Dr. DeJesus which were pending on or after the date of June 7, 2008. False claims in this action pre-date the FERA amendments since they began in January 2006 and are thus brought under the pre-FERA amendments to the FCA. False claims continue through at least April of 2012 and thus also fall within the post-FERA amendments.

### C.  ELIGIBILITY FOR THERAPY AND/OR REHABILITATIVE CARE

31.   HealthSouth, and Dr. DeJesus as HealthSouth's Medical Director, are responsible for determining eligibility for admission, participation in the establishment of the Plan of Care, provision or supervision of therapy or rehabilitative services, periodic review and updating of the Plan of Care for each individual receiving care, and establishment of policies governing the day-to-day provisions of services. 42 C.F.R. § 418.68(b). Dr. DeJesus appointed himself as the approval authority for every admission and as more fully discussed herein, admits patients to himself, which is in violation of the Stark Act, 42 U.S.C. § 1395nn (2010) and the Florida Patients Self Referral Act, § 456.053, Florida Statutes (2010).

32.   Medicare regulations require that a facility maintain a clinical record for each patient. 42 C.F.R. § 418.74.

33.   Each patient's clinical record must contain 1) the initial and subsequent assessments; 2) the Plan of Care; 3) identification data; 4) consent and authorization and election forms; 5) pertinent medical history; and 6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.). 42 C.F.R. § 418.74(a).

34.   A patient's clinical record must be sufficient to support claims for payment in that it must contain documentation to support the patient's treatment, progress and prognosis. 42 C.F.R. § 418.74.

### D.  THE SCHEME TO DEFRAUD THE UNITED STATES GOVERNMENT

35.   HealthSouth and Dr. DeJesus are and have been from at least January 2006 to at least April of 2012, engaged in a scheme to fraudulently charge the Medicare and Medicaid programs for therapeutic and rehabilitative services. Specifically, HealthSouth and Dr. DeJesus routinely and, as a pattern and practice, presented and/or caused to be presented false and fraudulent Medicare and Medicaid claims for payment in violation of 31 U.S.C. § 3729(a) and

Florida Statutes § 68.082(2), by knowingly submitting false or fraudulent claims to Medicare and Florida Medicaid for services rendered to patients who were: (1) ineligible for admission into HealthSouth's IRF under the SS Act (see paragraphs 25 and 26 herein); and/or (2) which did not meet professionally recognized standards of health care; and/or (3) submitted claims for payment for therapeutic and rehabilitative services that were being performed by uncertified personnel. In summary, the fraud consists of the following acts committed by HealthSouth and Dr. DeJesus from at least January 2006 through 2012, and on information and belief, through the present date:

    a.   HealthSouth and Dr. DeJesus knowingly and falsely certified patients as eligible to receive therapeutic and rehabilitative services, when in-fact they were not eligible for Medicare and Medicaid reimbursement, in order to falsely inflate the numbers of patients eligible for such benefits to meet the hospital's 60% Rule; and knowingly submitted false claims for payment for such ineligible patients. The false certifications include, but are not limited to, fabricated diagnoses, concealment of a patient's true condition in recording eligible criteria but omitting conditions that would show ineligibility; improperly detaining in the hospital patients whose condition was such that they no longer benefited from IRF services and who thus became ineligible for reimbursement; and falsifying a patient's physical examination to demonstrate criteria for eligibility. In fact, at any given time, at least two-thirds of the average patient population of 70-90 patients in HealthSouth's IRF were ineligible for admission. HealthSouth and Dr. DeJesus, knowing the ineligibility of the majority of HealthSouth's patients, conspired to submit and/or submitted to the Government claims for payment of $1,000 per day;

    b.   HealthSouth and Dr. DeJesus also knowingly submitted false claims for payment

by routinely billing for more services than were medically necessary; for example, over-utilization of consulting services, as more fully described in Section (III)(G) below;

c.   HealthSouth and Dr. DeJesus also knowingly submitted false claims for payment by billing Medicare for services at a higher level than that of the services actually performed; for example, billing for "one-on-one" physical and occupational therapy services when the therapist was servicing multiple patients at the same time, as more fully described in Section (III)(G) below;

d.   HealthSouth and Dr. DeJesus also knowingly submitted false claims for payment by billing Medicare for patients who were referred to HealthSouth and Dr. DeJesus pursuant to an illegal kickback scheme with medical facilities and doctors, as more fully described in Section (III)(F);

e.   HealthSouth falsely certified on Requests for Payment for IRF services that HealthSouth was in compliance with the federal and state healthcare statutes and regulations, in order to ensure payment by the Government;

f.   Dr. DeJesus routinely inflated the time he billed Medicare for providing patient services;

g.   HealthSouth and Dr. DeJesus also knowingly submitted false claims for payment by billing Medicare for "physical and occupational therapy" services performed by unqualified persons, who were neither licensed under state law nor enrolled in or met Medicare requirements for providing therapy. For example, Dr. Simon observed kitchen staff providing physical and occupational therapy, as more fully described in Section (III)(G);

> h.  In furtherance of the fraud, HealthSouth and Dr. DeJesus discriminated against Dr. Simon for her disclosure of and objection to the fraud to HealthSouth and Dr. DeJesus, her efforts to stop such fraud, her threats to report such fraud to the Government, and her investigation, preparation of, and filing of the instant *qui tam* action on February 3, 2012.

36.     As a result of HealthSouth and Dr. DeJesus' foregoing actions, HealthSouth wrongfully obtained tens of millions of dollars from the United States that it was not entitled to receive and Dr. DeJesus personally benefitted from the fraudulent scheme.

37.     Additionally, the overpayments fraudulently submitted by HealthSouth damaged the State of Florida through its Medicare and Medicaid programs.

E.     **ADMITTING AND RETAINING PATIENTS WHO DO NOT QUALIFY FOR MEDICARE SERVICES**

38.     HealthSouth and Dr. DeJesus have consistently admitted patients who are not eligible for admission under Medicare eligibility criteria and the Act, by (a) falsifying the diagnoses of such patients to make them appear to the Government to be eligible for admission and reimbursement for IRF services when, in fact, they were not; or (b) if otherwise eligible, to falsely make the diagnoses appear qualifying under the 60% Rule referenced in Paragraph 21(c) of this Complaint. A spreadsheet showing examples of such improperly admitted patients and their false diagnoses is attached as **Composite Exhibit 1.** Exhibit 1 shows a sampling of patients who were admitted to HealthSouth by Dr. DeJesus under a "false" diagnosis and were thus ineligible to receive inpatient rehabilitation services from Medicare. On information and belief, HealthSouth billed Medicare for rehabilitation services provided to the patients listed in Composite Exhibit I, despite their ineligibility.

39.     A true myopathy is a muscle disease. The condition of myopathy has widely

varying etiologies, including congenital or inherited, idiopathic, infectious, metabolic, inflammatory, endocrine and even drug-induced or toxic. These etiologies that result in myopathy, which have symptoms such as proximal muscle weakness, impaired functions of daily life, and, rarely, muscle pain and tenderness, should properly be coded as ICD-9 Code 359.89.

40.     In order to meet the 60% Rule and boost its profits, HealthSouth sent out a briefing team from its Alabama headquarters to the hospital with a PowerPoint presentation that attempted to convince Dr. Simon and other doctors at the hospital that patients could be admitted under a new diagnosis of "disuse myopathy" to be coded and thereby reimbursed as a "myopathy of known etiology" under ICD-9 Code 359.89.

41.     The term "disuse myopathy" was made up out of whole cloth by HealthSouth. The term is not found in the ICD-9 Code database (which has around 13,000 codes) or the more recently used ICD-10 Code database (which has around 68,000 codes), even though the ICD-10 codes are so extensive that they include very rare and unlikely diagnoses, such as "struck by an orca, initial encounter" or "sucked into a jet engine."

42.     Notwithstanding that disuse myopathy is nowhere found in the Codes, HealthSouth chose not to verify the presence of an actual autoimmune disease, endocrinopathy, renal insufficiency, or possibly one of several periodic paralyses such as familial hypokalemic periodic paralysis, but instead simply instructed its physicians that if there were common symptoms of myopathy, such as proximal muscle weakness or impaired function in daily life activities, they could admit and should admit under ICD-9 Code 359.89, and record a diagnosis of "disuse myopathy'' as "other myopathies not elsewhere classified." That classification, however, is for myopathies that actually exist, and not for a fraudulent myopathy such as disuse myopathy.

43.     In addition, HealthSouth told its Clinical Liaisons, who were out in the hospitals and other facilities, to tell social workers and physicians that they would admit patients when other rehabilitative hospitals and facilities refused to admit them. HealthSouth financially incentivized its Clinical Liaisons to increase the number of patients by using this false diagnosis; and offered lucrative "consultation fees" and fabricated medical directorships to referring physicians.

44.     As stated above, when Dr. Simon refused to admit patients under the false diagnosis of "disuse myopathy," Dr. DeJesus and HealthSouth would send the file to another physician, or to Dr. DeJesus himself, who would admit the patient on this false diagnosis. And, as it did with Dr. Simon, HealthSouth and Dr. DeJesus retaliated against doctors who balked at using the false diagnosis of disuse myopathy.

45.     Clinical Liaisons and Staff at HealthSouth have specifically been instructed by HealthSouth and Dr. DeJesus to admit patients who are not appropriate for admission under Medicare criteria with the assurances from HealthSouth and Dr. DeJesus that other professional staff would be responsible for obtaining supporting documentation of appropriateness.

46.     As a consequence of the fraudulent diagnoses of disuse myopathy, and other fraudulent diagnoses such as "Parkinsonian exacerbation" and "ataxia," HealthSouth was able to have its hospital in Sarasota qualify for the 60% Rule, which requires 60% of discharges for a given year to fall into one of thirteen diagnoses (CMS-13) in order to qualify for the prospective payment system, a more lucrative payment model than an acute care hospital receives.

47.     A second way that disuse myopathy affects Medicare patients is that Medicare uses a formula largely based on diagnoses and different tiers to estimate the length of stay that a patient will need in a rehab hospital, and it makes a lump-sum payment based on this calculation;

that is, the hospital receives more money the longer the length of stay is estimated for its patients.

48.     HealthSouth Sarasota was widely known as a rehab hospital that would admit anyone, irrespective of whether or not the patient would benefit from rehabilitation, as long as the patient had a payor source. The following egregious examples are just some of the cases in which HealthSouth fraudulently admitted patients under the made-up diagnosis of disuse myopathy and, therefore, since these patients could not benefit from rehabilitation, HealthSouth billed the Government for rehabilitation that was not "medically necessary:"

    a.   *Patient V*. Patient V was admitted first on June 24, 2010 by Dr. DeJesus as an 81-year-old with "progressive weakness," inability to ambulate, and knee abrasions. Dr. Simon's review of the patient's History and Physical/Post Admission Physician Evaluation ("H&P") and actual assessment reveals that the patient was a severe alcoholic. He was discharged on July 8, 2010 after it was noted that he had no problem walking (due, of course, to his now being sober). Patient V was re-admitted again on May 8, 2011, when EMS arrived at his home to find him drunk. He was retained until May 26, 2011. To make him appear eligible for admission and reimbursement under Medicare, Dr. DeJesus gave him an admission diagnosis of "disuse myopathy."

    b.   *Patient R*. Dr. Simon reviewed Patient R's H&P and has first-hand knowledge of this Patient's condition. Patient R was paralyzed below the waist due to an inoperative cancerous mass on his spinal cord. He was admitted at HealthSouth on September 27, 2011 for inpatient rehabilitation. His records showed that the cancer had metastasized and had traveled into his kidneys. His condition was terminal and he was therefore ineligible for rehabilitation. His Plan of Care,

however, included physical therapy for three hours a day, five days a week, the required minimum for Medicare reimbursement, in order to have him gain "full weight bearing status" in his "lower extremities," an impossibility given the inoperative tumor on his spine. On October 17, 2011, Dr. Daniel Hume noted in the H&P that the patient's prognosis was "good to achieve these results," which was a medical impossibility.

    c.   *Patient D*. Dr. Simon reviewed Patient D's H&P and has first-hand knowledge of his condition. Patient D was a 93-year-old who had prostate cancer which had metastasized. He was clearly ineligible for rehabilitation due to his imminent terminal diagnosis and died 16 days after being admitted by Dr. DeJesus into the hospital on October 1, 2011, with a false diagnosis of "disuse myopathy." Dr. DeJesus noted in the H&P that Patient D was being admitted for "comprehensive inpatient rehabilitation." After the hospital received 16 days of improper reimbursement for Patient D, hospice was finally consulted on October 17, 2011, the day Patient D died.

49.    On information and belief, HealthSouth billed Medicare for rehabilitation services for Patients V, R and D, despite their ineligibility for admission under Medicare regulations.

50.    Dr. Simon estimates that at least 66% of the daily patient census admitted to HealthSouth's hospital were not qualified for admission under Medicare criteria. The daily patient census has changed during the relevant period from 35 patients in January 2006 to 86-90 patients in October 2011, even though the population of Sarasota has not significantly increased and the admission criteria became more restrictive.

51.    At least beginning in January, 2006, HealthSouth has obtained payment from

Medicare for, on average, 40 ineligible patients a day at $1,000 a day or $14.6 million a year.

52.     HealthSouth and Dr. DeJesus have also routinely delayed patient discharges in order to continue billing their fraudulent charges to Medicare by intentionally prolonging the process of determining whether a patient no longer requires care in order to inflate their charges to Medicare or benefit from receiving the entire payment designated by diagnosis code by artificially prolonging medically unnecessary hospital stays. For example, Dr. Simon knows that some patients who should be immediately  referred to a Skilled Nursing Facility ("SNF") or Acute Care Facility ("ACF") or a Hospice are retained in the hospital for the maximum time to ensure that HealthSouth obtains the maximum amount from Medicare based on number of days in the hospital.

53.     HealthSouth and Dr. DeJesus also have engaged in a fraudulent scheme to bill Medicare and Medicaid for internal medicine, pulmonology, psychological, psychiatric, and similar consultation services that were over utilized and medically unnecessary. A spreadsheet of examples of unnecessary consults showing Medical Record Number, Date and Type of Consultation, etc., is attached as **Composite Exhibit 2.** Dr. Simon has personal knowledge of the patients listed in Composite Exhibit 2 and the medically unnecessary nature of each of the consults for these patients. Additionally, Dr. Simon is aware that Dr. DeJesus orders or ordered multiple consultations for virtually every patient he admits for rehabilitation at HealthSouth under his care.

54.     In some cases, and as more fully described herein, HealthSouth and Dr. DeJesus use the frequent billing and reimbursement of consultation services as an incentive to doctors outside the hospital to refer ineligible patients to the hospital and Dr. DeJesus.

55.     Dr. DeJesus has also fraudulently billed Medicare and Medicaid for the number

of hours for which he has allegedly provided services. Attached as **Composite Exhibit 3** are Dr. DeJesus' time records for the time period of October 17, 2011, to October 21, 2011. His records show that during this time period Dr. DeJesus averaged 13.18 billable hours/day, and on two days he billed in excess of 16 hours/day for patient services, all in addition to his administrative duties as Medical Director.

56.     HealthSouth and Dr. DeJesus earn their income from the provision of therapeutic and rehabilitative services, and their fraudulent and deceitful scheme intentionally caused the payment of Medicare claims which were false or fraudulent in order to enrich themselves.

57.     Dr. Simon gained direct and independent knowledge of the above-mentioned false claims by working as the Program Medical Director for HealthSouth. Her knowledge was gained by actual observation and experience at HealthSouth's IRF, including knowledge gained by talking with HealthSouth, Dr. DeJesus and other staff members employed at the hospital and in a review of medical records they were authorized to access or that were readily accessible.

### F.     PATIENT BROKERING: ESTABLISHING ILLEGAL KICKBACK SCHEMES IN ORDER TO INCREASE REFERRALS

58.     Starting before June of 2008, in order to elicit increased referrals from medical facilities and doctors, HealthSouth and Dr. DeJesus provided referring physicians with the opportunity to be reimbursed by Medicare for improper and medically unnecessary consultations in violation of the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Florida's Patient Brokering Statute, § 817.505(a)(a) and the Stark Law, 42 U.S.C. § 1395nn. In other words, referring physicians know that patients they refer will be improperly admitted to HealthSouth, and that the referring doctors will, in turn, receive back from HealthSouth and Dr. DeJesus medically unnecessary consultations for which they can and do bill Medicare as a way to conceal what is, in reality, an illegal kick-back fee.

59.     HealthSouth and Dr. DeJesus have offered kickbacks in the form of these medically unnecessary consult fees to incentivize illegal referrals in violation of the above-referenced statutes. These consultations performed by referring doctors, specifically including doctors from the Intercoastal Medical Group, were not commercially reasonable and did not further the business purpose of HealthSouth, since the consultations were not medically necessary and performed on patients improperly admitted.

60.     The acts of HealthSouth and Dr. DeJesus violated the Anti-Kickback Statute and Stark Laws; and thus resulted in the knowing submission of false claims for reimbursement from Medicare for patients referred under an illegal kickback scheme since, under the Patient Protection and Affordable Care Act ("PPACA"), a violation of the Anti-Kickback Statute is a false claim and Florida's statute prohibits such acts outright.

61.     A spreadsheet of examples of the illegal referrals/consultations is attached as **Composite Exhibit 4.** The patients listed in Exhibit 4 were patients in which the referring doctor was also retained by HealthSouth to perform a consult. The consults were not medically necessary and the patients in this Exhibit were not eligible to receive rehabilitation services under Medicare. On information and belief, HealthSouth billed Medicare and received payment for the rehabilitation and consultation services for the patients identified in Composite Exhibit 4.

## G.     PROVIDING    IMPROPER    STAFFING    AND    UNLICENSED PROVIDERS

62.     HealthSouth has knowingly provided inadequate staffing levels for its patients and has consistently allowed unlicensed individuals to provide patient care.

63.     For example, HealthSouth has allowed non-medical staff to provide medical services to patients, including several instances observed by Dr. Simon in which kitchen staff provided group physical therapy to patients. These instances of kitchen staff providing group

therapy occurred in between 2006 and 2008, and HealthSouth fraudulently billed Medicare for individual physical therapy by a licensed therapist for these patients who instead received group therapy from kitchen staff.

64.     Additionally, between January 2006 through 2012, and on information and belief through the present day, HealthSouth routinely provided "group" therapy to patients, rather than individual therapy as required by Medicare regulations. Dr. Simon witnessed these sessions multiple times in 2011 where one physical therapist provided therapy to a group of patients at one time. HealthSouth has fraudulently billed Medicare for reimbursement for individual therapy for these patients, falsely certifying that they received individual therapy.

65.     Finally, HealthSouth has knowingly allowed unlicensed therapy students to provide hands-on treatment to patients without the supervision of a licensed provider. Specifically, HealthSouth routinely allows unlicensed physical therapy students to provide therapy to patients without the supervision by a licensed therapist. Dr. Simon has observed this practice on multiple occasions in the years between 2007 and 2012 and has personal knowledge that HealthSouth billed Medicare for these patients for therapy performed by a licensed provider.

66.     Dr. Simon has engaged the undersigned attorneys to represent her interests and said attorneys are entitled to a reasonable fee for their services.

## COUNT I: DISCRIMINATION CLAIM
## PURSUANT TO 31 U.S.C. § 3730(h)

67.     Dr. Simon re-alleges and incorporates by reference paragraphs 1 through 66.

68.     This is an action pursuant to 31 U.S.C. § 3730(h).

69.     Dr. Simon has acted lawfully in furtherance of an action under Section 3730 and has made other efforts to stop one or more violations of 31 U.S.C. Chapter 37, Subchapter III, which acts are protected under Section 3730(h). Such protected activities include, but are not

limited to:

    a.  Multiple times between early 2008 and her constructive discharge in 2012, Dr. Simon objected to and threatened to report to the Government HealthSouth and Dr. DeJesus' practice of falsifying the diagnoses of patients so they could be admitted and/or qualify under the 60% Rule. Dr. Simon's objections and threats to report such behavior included, but were not limited to:

        i.  Reporting to HealthSouth's CEO (first Dan Eppley ("Eppley"), and later Marcus Braz ("Braz")) during several in-person meetings that the practice of inappropriately coding patients' diagnoses as disuse myopathy, Parkinsonian exacerbation, ataxia, or other false diagnoses constituted fraud on the Government or Medicare fraud, that she would not make such fraudulent diagnoses, and that she may need to report the practice to the Government.

        ii.  During multiple monthly in-person meetings she attended with Dr. DeJesus, other HealthSouth physicians, and the HealthSouth CEO, stating that she refused to admit patients under disuse myopathy, Parkinsonian exacerbation, ataxia, or other diagnoses if such a diagnosis was unsupported and that doing so would be lying in medical records, and would constitute fraudulent activity and making false claims to the Government.

        iii.  During a presentation in which HealthSouth representatives explained in detail how to falsely document disuse myopathy, Parkinsonian exacerbation, ataxia, and other diagnoses, publicly objecting to the

practice and stating that it constituted fraud. Immediately after that presentation, Dr. Simon repeated these comments to Braz one-on-one.

iv.   On several phone calls and in-person discussions with Marketing Director Nancy Arnold ("Ms. Arnold"), during which Ms. Arnold directed Dr. Simon to falsely document a diagnosis of disuse myopathy, telling Ms. Arnold that it would be fraud to document disuse myopathy if that was not the patient's condition, she refused to say anything untrue in a patient's medical records, and doing so was stealing from the government;

v.   Telling Dr. DeJesus in several face-to-face conversations that using the disuse myopathy, Parkinsonian exacerbation, ataxia, or another false diagnosis for patients who did not have the condition was a fraudulent billing practice.

vi.   In multiple phone calls with admissions liaisons who directed Dr. Simon to falsely document disuse myopathy, Parkinsonian exacerbation, ataxia, or other false diagnoses, telling the admissions liaisons that it would be fraud if she did so, and if HealthSouth's practice of falsely coding disuse myopathy and other diagnoses continued, she would have to report it to the Government.

b.   Multiple times between 2008 and her constructive discharge in 2012, Dr. Simon objected to and threatened to report to the Government HealthSouth and Dr. DeJesus' practices of routinely overbilling hours, billing for medically unnecessary procedures, and calling for unnecessary consultations in order to fraudulently claim Medicare reimbursements. Dr. Simon's objections and threats

to report such behavior included, but were not limited to:

  i.   Reporting multiple times to HealthSouth's CEO, risk managers, and Dr. DeJesus himself that Dr. DeJesus' kickback arrangement with referring physicians, whereby the referring physicians would send patients to be improperly admitted at HealthSouth and in exchange HealthSouth physicians would seek unnecessary consults with referring physicians and bill such consults to Medicare, constituted fraud on the Government which Dr. Simon indicated she may have to report.

  ii.  Complaining multiple times to HealthSouth's CEO, other HealthSouth physicians, and Dr. DeJesus himself that the practice of seeking unnecessary consults for patients in order to be able to bill the consults to Medicare constituted fraud on the Government which Dr. Simon indicated she may have to report.

  iii. Complaining many times to HealthSouth's CEO and risk managers that Dr. DeJesus and other physicians were billing for medically unnecessary services, which was fraud on the Government and which Dr. Simon indicated she would report to the Government.

  iv.  Reporting to the Medical Executive Committee and Dr. DeJesus himself that Dr. DeJesus was billing such an excessive number of hours that it was impossible for his billing numbers to be true, and that submitting inflated billable hours to the Government constituted fraud. Dr. DeJesus did not deny that he was overbilling but tried to justify doing so.

c.  Multiple times between 2008 and 2011, Dr. Simon objected to HealthSouth's

practiced of incorrectly billing therapy sessions to Medicare. Dr. Simon's objections included, but were not limited to:

i.    Complaining to the head of the Therapy Department or HealthSouth risk management that she had observed members of the kitchen staff leading group therapy sessions, and billing that to Medicare was fraud on the Government.

ii.    Complaining to the head of the Therapy Department that patients who had attended group therapy sessions were being certified as having attended individual therapy sessions (which command a higher reimbursement rate), and that falsely billing Medicare for individual therapy sessions was fraud on the Government.

iii.    Complaining to members of the Therapy Department that unlicensed, unsupervised therapy students had been conducting therapy sessions.

70.    Dr. Simon followed through with her threats to report HealthSouth and Dr. DeJesus' fraudulent activity. She investigated, prepared, and then filed the instant *qui tam* action on February 3, 2012.

71.    HealthSouth and Dr. DeJesus were aware that Dr. Simon was engaging in protected activity; in fact, as described above, she openly discussed much of her protected activity with them.

72.    HealthSouth and Dr. DeJesus harassed, demoted, and engaged in other discriminatory and retaliatory conduct against Dr. Simon, from at least March 2008 through her constructive discharge in 2012, because of her aforesaid protected activities, in ways including but not limited to the following:

a. In or around March 2008, Dr. DeJesus physically cornered Dr. Simon near the Nursing Station, verbally assaulting and threatening Dr. Simon because she refused to admit a patient with a false diagnosis. Dr. Simon maintained her refusal during the confrontation, telling Dr. DeJesus that it would be defrauding the Government to document and admit a patient using a false diagnosis. Dr. DeJesus then threatened her job, saying he could "destroy" her and telling her to remember what had happened to a previously employed physician (Dr. McGaharan) whom Dr. DeJesus had pushed out. This incident took place in the presence of Isabella Polivchak, physical therapist, and Cindy Tyler, registered nurse.

b. Dr. DeJesus repeatedly threatened Dr. Simon's job by reminding her "what [he] did to Dr. McGaharan" and telling her if she kept pushing, she would be "out of here."

c. HealthSouth's Marketing Director also threatened Dr. Simon in response to Dr. Simon's protected activities by telling her "You better do it [engage in fraudulent billing practices as directed] or things will start happening," and "You are playing with fire. You are the little person; you have to do what you're told, or things will start happening."

d. In 2009, and in retaliation for her ongoing objections to HealthSouth's and Dr. DeJesus' fraudulent billing and documentation practices, Dr. DeJesus, through HealthSouth, demoted Dr. Simon by having her removed from the Medical Executive and Credentialing Committee and removing her from her position as Medical Chief of Staff.

e. In or around March 2010, after a patient of Dr. Simon's developed a pressure

sore as a result of insufficient nursing care stemming from inadequate staffing, HealthSouth CEO Eppley summoned Dr. Simon for an emergency meeting, refusing to tell Dr. Simon what the meeting was about. Dr. Simon appeared for the meeting accompanied by an attorney. Upon seeing the attorney, Eppley left the room to confer with Dr. DeJesus; more than an hour later, Eppley returned and called off the meeting with Dr. Simon. Eppley called this meeting to intimidate Dr. Simon because of her ongoing objections to HealthSouth's and Dr. DeJesus' fraudulent billing and documentation practices.

f.  In or around November 2010, HealthSouth's then-new CEO Braz revoked Dr. Simon's admitting privileges, only allowing Dr. Simon to admit patients whose referring physicians would give Dr. Simon letters of permission to admit their patients.  Braz did not tell Dr. Simon why he was doing this, telling her "I don't have to explain anything to you." HealthSouth imposed these restrictions on Dr. Simon in retaliation for her protected activities and with the intent to significantly reduce her patient load and force Dr. Simon to resign. As a result of these restrictions, Dr. Simon's patient load was cut by more than half.

g.  On or around November 19, 2010, Braz, Dr. DeJesus, and other members of HealthSouth management met with Dr. Simon and told her that HealthSouth would be launching a formal, 6-month investigation into a scrivener's error that had appeared, and been corrected, in one of Dr. Simon's patient charts. HealthSouth informed Dr. Simon that the severe restrictions on her admitting privileges would remain in place. Dr. Simon asked Dr. Gabriel, head of the Medical Executive Committee, whether the meeting and investigation were

because of Dr. Simon's protected activity regarding HealthSouth's fraudulent billing and documentation practices, and Dr. Gabriel did not deny it.

h.  In late 2010, in further retaliation for her protected activities, HealthSouth demoted Dr. Simon by removing her from her Medical Director position.

i.  During HealthSouth's 6-month investigation, in retaliation for her protected activities and as a further effort to force Dr. Simon to resign, Dr. DeJesus began ordering HealthSouth's admitting liaisons to put the name of patients' primary care physicians on the admissions paperwork (rather than the physicians who referred those patients to Dr. Simon), which would prevent those patients from being seen by Dr. Simon even if Dr. Simon had a permission letter from that referring physician.

j.  In 2011, in further retaliation for her protected activities, HealthSouth demoted Dr. Simon again by removing her from her position on the Pharmaceuticals and Therapeutics Committee.

k.  After the end of the 6-month investigation, during which HealthSouth found no evidence of wrongdoing by Dr. Simon, HealthSouth did not lift the restrictions on Dr. Simon's admitting privileges. In fact, in another act of retaliation for Dr. Simon's protected activities, HealthSouth forced Dr. Simon to revoke all of her permission letters. As a result, a referring physician had to specifically put Dr. Simon's name on each patient's referral, or the patient would be assigned to Dr. DeJesus. These restrictions humiliated Dr. Simon, and drastically reduced her patient load. Dr. Simon's patient load dropped to 2 patients, reducing her income to a fraction of its previous amounts.

l.  In or around April 2011, Dr. DeJesus told Dr. Simon that he would no longer cover her patients on weekends, forcing Dr. Simon to work or be on call seven days a week.

73.     The cumulative effect of these and other retaliatory actions by HealthSouth and Dr. DeJesus (with HealthSouth's knowledge) constitute a constructive discharge of Dr. Simon.

74.     But for Dr. Simon's protected activities as described above, HealthSouth and Dr. DeJesus would not have engaged in retaliatory and discriminatory actions against Dr. Simon, including but not limited to those listed above.

75.     The retaliation suffered by Dr. Simon was discriminatory, and in violation of 31 U.S.C. § 3730(h). As a consequence, Dr. Simon's income was dramatically reduced and her admitted patient load went from 35 patients to 2, resulting in her constructive discharge in 2012 and significant emotional distress.

76.     By virtue of this discrimination, Dr. Simon has suffered damages.

WHEREFORE, Dr. Simon respectfully requests this Court enter judgment against Defendants as follows:

a.  That Dr. Simon be awarded compensation for the retaliatory, discriminatory actions taken violation of § 3730(h) in the following amounts:

    iv.  lost compensation based on the same seniority status as she would have had but for the discrimination;

    v.  two times the amount of back pay;

    vi.  interest on the back pay; and,

    vii.  compensation for the special damages sustained as a result of the retaliation and discrimination, including emotional distress damages,

litigation costs and reasonable attorneys' fees;

    b.   That this Court award such other and further relief as it deems proper.

<b><u>COUNT II: CLAIM FOR ATTORNEYS' FEES</u></b><br><b><u>PURSUANT TO 31 U.S.C. § 3730(d) and (h)</u></b>

77.    Dr. Simon re-alleges and incorporates by reference paragraphs 1 through 66.

78.    On June 28, 2019, HealthSouth reached a settlement agreement with the United States Department of Justice whereby it agreed to pay $48 million to resolve allegations that it made false claims for Medicare reimbursement based on, among other things, inaccurate diagnoses; medically unnecessary procedures, consultations, and admissions; misclassified therapy sessions; inflated hours; and other fraudulent billing and document practices.

79.    To effectuate this settlement, the Government intervened in this case and two others.

80.    Pursuant to the settlement agreement, Dr. Simon agreed to the dismissal of her Federal *qui tam* FCA claims against HealthSouth, preserving her retaliation claim pursuant to 31 U.S.C. § 3730(h), as well as her claims for attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d).

81.    As a prevailing plaintiff pursuant to 31 U.S.C. § 3730(d) on the underlying FCA claims brought on behalf of the United States of America that was paid a Relator's share by the DOJ, Dr. Simon, individually, is entitled to the payment of her attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d). However, as of the date of this filing, HealthSouth has not yet agreed to pay such fees, costs and expenses. As a prevailing plaintiff on the underlying FCA claims brought on behalf of the United States of America, Dr. Simon, individually, is also entitled to the payment of any attorneys' fees and costs incurred in her attempts to collect attorneys' fees, costs and expenses due and owing from HealthSouth.

82.    Dr. Simon is also entitled to the payment of all attorneys' fees and costs incurred in the prosecution of her retaliation claims brought under 31 U.S.C. § 3730(h).

WHEREFORE, Dr. Simon respectfully requests this Court enter judgment against Defendants as follows:

    a.    That Dr. Simon be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. §§ 3730(d), 3730(h), and any other applicable provision of law; and

    b.    That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Dr. Simon demands a jury trial on all claims alleged herein.

Respectfully submitted,

/s/ *Jacqueline M. Prats*
JOHN S. VENTO
Florida Bar No. 0329381
jvento@trenam.com / jyarnell@trenam.com
RICHARD M. HANCHETT
Florida Bar No. 709212
rhanchett@trenam.com / achrisman@trenam.com
ALICIA H. KOEPKE
Florida Bar No. 0026330
akoepke@trenam.com / achrisman@trenam.com
JACQUELINE M. PRATS
Florida Bar No. 0118862
jprats@trenam.com / lvalente@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN,
O'NEILL & MULLIS, P.A.
101 E. Kennedy Blvd., Ste. 2700
Tampa, Florida 33602
Telephone: (813) 223-7474
Facsimile: (813) 229-6553
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing **Second Amended Complaint and Demand for Jury Trial** has been electronically filed on July 17, 2019 with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing and copy to the parties and counsel of record.

/s/ *Jacqueline M. Prats*
Attorney