## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

EMESE SIMON, M.D., an individual; and FLORIDA
REHABILITATION ASSOCIATES, PLLC, a Florida
Limited Liability Company,

      Plaintiffs,

v.

ENCOMPASS HEALTH REHABILITATION
HOSPITAL OF SARASOTA, LLC, a Delaware limited
liability company, f/k/a HEALTHSOUTH
REHABILITATION HOSPITAL OF SARASOTA,
LLC, a Delaware limited liability company, f/k/a
HEALTHSOUTH OF SARASOTA LIMITED
PARTNERSHIP, an Alabama limited partnership d/b/a
HealthSouth Rehabilitation Hospital of Sarasota;
HEALTHSOUTH REAL PROPERTY HOLDING,
LLC, a Delaware Limited Liability Company; and
HEALTHSOUTH CORPORATION, a Delaware
corporation, n/k/a ENCOMPASS HEALTH
CORPORATION,

      Defendants.

Civil Action No.: 8:12-cv-236

## THIRD AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

### I.    INTRODUCTION

1.    This action originated as an action to recover treble damages and civil penalties in

excess of $50 million on behalf of the United States of America arising from false statements and

claims made or caused to be made by Defendants to the United States and its agents and

intermediaries in violation of the False Claims Act, 31 U.S.C. § 3728 *et seq.* (the "FCA") by Emese

Simon, M.D. ("Dr. Simon"), individually and as the sole manager of Florida Rehabilitation

Associates, PLLC ("Florida Rehab") ("Plaintiffs"); and to recover damages arising from

Defendants' retaliatory and discriminatory actions against Plaintiffs. Defendants knowingly made, used or caused to be made or used false records and statements material to false or fraudulent claims for payment in connection with therapy and rehabilitative services. When Dr. Simon, both individually and on behalf of Florida Rehab, reported, objected to, or refused to participate in Defendants' fraudulent practices, Defendants retaliated against and constructively discharged her.

2.      After an extensive investigation that lasted seven years, on June 28, 2019, Defendant HealthSouth Corporation (n/k/a Encompass Health Corporation) reached a settlement agreement with the United States Department of Justice whereby it agreed to pay $48 million to resolve allegations Dr. Simon and others made regarding false claims for Medicare and Medicaid reimbursement based on, among other things, inaccurate diagnoses; medically unnecessary procedures, consultations, and admissions; misclassified therapy sessions; inflated hours; and other fraudulent billing practices.

3.      To effectuate this settlement, the United States Government filed an Unopposed Motion to Intervene For Purposes of Settlement in this case and two others.  These motions were granted by the Court on June 27, 2019.

4.      Pursuant to the settlement agreement and this Court's June 27, 2019 Order, the Government and Dr. Simon (as an individual) filed a Joint Stipulation of Dismissal on July 2, 2019, in which, *inter alia*, Dr. Simon agreed to the dismissal of only her Federal *qui tam* claims pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") against Defendants, preserving her personal retaliation claims pursuant to 31 U.S.C. § 3730(h), as well as her claims for attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d) which Defendants refused to address as part of the overall settlement with the Government.[1]  The Court entered an Order

---

[1] As a prevailing plaintiff, Relator Simon is entitled to the payment of her attorneys' fees, costs and expenses pursuant to U.S.C. § 3730(d).

approving the Stipulation of Dismissal on July 3, 2019.

5.      On July 3, 2019, as a result of the partial settlement agreement, this Court partially dismissed the action but retained jurisdiction over Dr. Simon's personal claims under 31 U.S.C. § 3730(h).

6.      On July 10, 2019, this Court granted Plaintiffs' Motion for Leave to File a Second Amended Complaint, and Plaintiffs filed their Second Amended Complaint on July 17, 2019.

7.      On October 24, 2019, Defendants filed a Motion for Judgment on the Pleadings and Memorandum of Law in Support.

8.      On December 16, 2019, in response to Defendants' October 24, 2019 Motion for Judgment on the Pleadings, this Court granted leave for Plaintiffs to amend their Third Amended Complaint.

## II.      PARTIES, JURISDICTION AND VENUE

9.      This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"). This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

10.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein took place at a health care facility located in the Middle District of Florida, and is also proper pursuant to 28 U.S.C. § 139l(b) and (c) because at all relevant times Defendants transacted business in the Middle District of Florida.

11.      Encompass Health Rehabilitation Hospital of Sarasota LLC, a Delaware limited liability company, was formerly known as HealthSouth Rehabilitation Hospital of Sarasota, LLC, a Delaware limited liability company; which was formerly known as HealthSouth of Sarasota Limited Partnership, an Alabama limited partnership, d/b/a HealthSouth Rehabilitation Hospital of Sarasota (collectively the "Hospital"). The Hospital provided inpatient and, from 2005 to 2009,

outpatient therapy and rehabilitative services at its facility located at 6400 Edge Lake Drive, Sarasota, Florida 34240.

12.    In a sworn statement previously filed with this Court (Dkt. 125-2), Defendants allege that on May 31, 2012, HealthSouth of Sarasota limited partnership "converted" to a Delaware limited liability company and changed its name to HealthSouth Rehabilitation Hospital of Sarasota LLC.  However, a diligent search of the Delaware corporate filings shows that at the "conversion" date on May 31, 2012, the Hospital HealthSouth Limited partnership did not convert and it appears to have become a Delaware limited partnership.  *See* **Exhibit 1**.  A search of the Alabama corporate records shows that the partnership "dissolved," and did <u>not</u> "convert."  *See* **Exhibit 2**.  To be an effective "conversion," the partnership would have had to "convert" in both states.  Thus, because of the defective conversion, the Alabama partnership never dissolved and remained in existence as an Alabama partnership.  Further, the partnership did not change its name in Delaware to HealthSouth Rehabilitation Hospital of Sarasota LLC until July 3, 2018, apparently the date of "conversion" of the Alabama partnership.  (*See* **Exhibit 2**).

13.    At all times relevant to this action, defendant HealthSouth Real Property Holding, LLC ("HealthSouth Real Property") was a Delaware limited liability company and the Hospital's general partner (until it withdrew its license to do business in Florida on July 31, 2012, after to the time it and its limited partner Hospital retaliated against Plaintiffs and constructively discharged Dr. Simon in April 2012).  As a general partner of an Alabama limited partnership, a general partner may be liable, jointly and severally, for all debts, obligations and liabilities of the limited partnership.  *See* Ala. Code §10A–9A–4.04(a).

14.    At all times material to this action, defendant HealthSouth Corporation, now known as Encompass Health Corporation ("HealthSouth Corporation"), was a Delaware corporation.  At

all times material to this action, HealthSouth Corporation was the managing member of HealthSouth Real Property and the sole member of that limited liability company. At all times material to this action, HealthSouth Real Property, HealthSouth Corporation and the Hospital all listed in corporate papers a common address, 3360 Grandview Parkway, Suite 200, Birmingham, Alabama.

15. Because it appears that the "conversion" of the Hospital partnership in 2012 was defective (and not corrected until 2018), HealthSouth Corporation n/k/a Encompass Health Corporation became the Alabama partnership's general partner by stepping into the shoes of HealthSouth Real Property (of which the corporation was its managing member) and, therefore, the Corporation does not have the benefit of Alabama's safe harbor statute insulating a "new general partner" of an existing limited partnership for previously incurred debts. *See* Ala. Code § 10A–9A–4.04. As the general partner of an Alabama limited partnership, HealthSouth Corporation is liable, jointly and severally, for all debts, obligations and liabilities of the limited partnership. *Id.*

16. In its notes to its December 31, 2016 Form 10-K, at page 205 of 233, **Exhibit 3**, HealthSouth Corporation disclosed that on June 24, 2011 it received a document subpoena addressed to HealthSouth Hospital of Houston, in which it was stated that the subpoena was issued "in connection with an investigation of possible false or otherwise improper claims submitted to Medicare and Medicaid, and requested documents and materials relating to patient admissions, length of stay and discharged matters… ." It also states that on March 4, 2013, document subpoenas from an office of HHS-OIG were addressed to four other hospitals owned by HealthSouth Corporation. One of these hospitals was the Sarasota hospital. The filing goes on to note that the "investigation is being conducted by the United States Department of Justice;" and

that all of the subpoenas were issued "in connection with an investigation of alleged improper or fraudulent claims submitted to Medicare and Medicaid and request[ed] documents and materials relating to practices, procedures, protocols and policies, of certain pre- and post- admissions activities at these hospitals including among other things, marketing functions, pre-admissions screening, post-admission physician evaluations, patient assessments instruments, individualized patient plans of care, and compliance with the Medicare 60% rule." The filing also noted that it was not possible for the company "to estimate an amount of loss, if any, or range of possible loss that might result from it [the investigation]." Finally, the filing notes that "it is possible that qui tam lawsuits have been filed against us and those suits remain under seal … ."

17.     The 10-K filing shows that, certainly before it withdrew from doing business in Florida in 2012 and allegedly dissolved according to the Defendants in 2017, HealthSouth Real Property had knowledge of "claims that have not been made known to the limited liability company or that have not arisen but that, based on facts known to the limited liability company, are likely to arise or to become known to the limited liability company within ten years of the date of dissolution." Del. Code Ann. tit. 6, § 18-804(b). HealthSouth Real Property was required to "make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the limited liability company." *Id.* There is nothing in the corporate records in Delaware to show that HealthSouth Real Property made any such provision as will be reasonably likely to be sufficient to provide compensation to Plaintiffs for a likely claim known to it.  Nor would any dissolution of HealthSouth Real Property absolve or insulate it from liability as the general partner of an Alabama limited liability partnership.  Ala. Code § 10A–9A–4.04(a).

18.     Further, to the extent that HealthSouth Real Property's assets were transferred to HealthSouth Corporation upon any dissolution, those assets could also be a source of liability to

HealthSouth Corporation to the extent of the assets transferred.

19.    Dr. Simon provided services at the Hospital as a member of the Admitting Medical Staff. She served as a Program Medical Director of the Spinal Cord Injury Program, as both President and Vice President of the Medical Staff, and as the Chair of its Pharmacy and Therapeutics Committee at the Hospital. She is a Fellow of the American Academy of Physical Medicine and Rehabilitation and Board Certified in Physical Medicine and Rehabilitation.

20.    Florida Rehabilitation Associates, PLLC ("Florida Rehab") is a Florida professional limited liability company that is wholly owned and operated by Dr. Simon. At all times relevant to this action, Florida Rehab has been authorized to do business in Florida.  Florida Rehab, as a corporate entity, is covered by the FCA's retaliation provision.  31 U. S. C. § 3730 (h)(1).

21.    On May 23, 2006, Dr. Simon and Florida Rehab entered into a Physician Recruitment Agreement (the "Recruitment Agreement," attached hereto as **Exhibit 4**) with the Hospital, then the Alabama limited partnership known as HealthSouth of Sarasota Limited Partnership.  Linda Wilder ("Ms. Wilder"), executed the Recruitment Agreement on the Hospital's behalf as its Authorized Representative, listing her title as "Senior Vice President, HealthSouth Corporation," confirming the control of HealthSouth Corporation over HealthSouth Real Property Holdings, the then-general partner of, and, the Hospital. Furthermore, all notices under the Recruitment Agreement were to be sent in care of the Legal Department at HealthSouth Corporation.  Thus, from the execution of the Recruitment Agreement by its Senior Vice President, HealthSouth Corporation was also an entity which contracted with Dr. Simon and Florida Rehab.

22.    At all times relevant to this action, HealthSouth Real Property in its own right contractually and as the general partner of Hospital had control over the Hospital's policies and/or

actions, including but not limited to the Hospital's physician recruitment and retention activities (including Plaintiffs'), medical director recruitment and retention activities (including Dr. Simon's), staffing policies and practices, and enforcement of same.

23.    At all times relevant to this action, HealthSouth Corporation in its own right contractually and as the managing member of HealthSouth Real Property had control over the Hospital's policies and/or actions, including but not limited to the Hospital's physician recruitment and retention activities (including Plaintiffs'), medical director recruitment and retention activities (including Plaintiffs'), patient admissions, billing practices, staffing policies and practices, and the enforcement of same.

24.    Concurrently with and in relation to the Recruitment Agreement, Dr. Simon executed a revolving note requiring payments to be sent to the Hospital at HealthSouth Corporation's headquarters in Birmingham, Alabama.

25.    The Recruitment Agreement had an initial term of four years. It specified that Plaintiffs were considered to be independent contractors. However, the Recruitment Agreement also imposed a number of obligations on Plaintiffs, including but not limited to the following:

    a.  Plaintiffs were required to "engage in the full-time practice of medicine" for forty hours per week within the Service Area and in the area of physical medicine;

    b.  Plaintiffs were required to "undertake all ordinary services and obligations" of the Hospital's medical staff, including submitting to rotating on-call service schedules set by the Hospital and serving as members of the Hospital's medical staff and committees if so required by the Hospital;

    c.  Plaintiffs were governed by the Hospital's Board of Directors; Medical Staff Bylaws; Medical Staff Rules and Regulations; and applicable Hospital policies;

d.   Plaintiffs were required to "participate in such Hospital departmental meetings and quality management and other peer review activities as required by Hospital and Hospital's Medical Staff Bylaws . . . and . . . such Medical Staff committees as reasonably requested by Hospital";

e.   Plaintiffs were prohibited from assigning the Recruitment Agreement without prior written consent of the Hospital;

f.   Plaintiffs were prohibited from engaging subcontractors to provide services under the Recruitment Agreement without prior written consent of the Hospital.

26.   Therefore, notwithstanding the language of the Recruitment Agreement disclaiming otherwise, the above restrictions, prohibitions and obligations show that, in the course of their dealings, Dr. Simon and Florida Rehab were not only contractors, but employees, and/or agents of the Hospital, its managing partner, HealthSouth Real Property, and by virtue of the execution of the Recruitment Agreement by Ms. Wilder, HealthSouth Corporation.

27.   On October 1, 2008, Dr. Simon and the Hospital entered into a Program Medical Direction Services Agreement ("Medical Direction Agreement," attached hereto as **Exhibit 5**), pursuant to which Dr. Simon agreed to provide medical direction services as an independent contractor. HealthSouth Real Property, as the Hospital's general partner, executed the Agreement by its "authorized representative," Ms. Wilder—the same Ms. Wilder who was Senior Vice President of HealthSouth Corporation. The Medical Direction Agreement had a term of one year and automatically renewed unless terminated by either party at any time on 30 days' notice.

28.   As further evidence that the Medical Direction Agreement executed by HealthSouth Corporation's corporate Senior Vice President, Linda Wilder, was an Agreement that was entered into not only with the Hospital's limited partnership, but also HealthSouth

9

Corporation, Paragraph 2.7 states as follows: "HealthSouth is covered by Corporate Integrity Agreement (CIA) made between HealthSouth Corporation and the Office of the Inspector General, which imposes certain restrictions on contractors furnishing certain services on behalf of the Hospital." It then goes on to require Dr. Simon and Florida Rehab to comply with the CIA entered into, not by the Hospital, but by the HealthSouth Corporation itself. Because the Agreement interchangeably uses the term HealthSouth to refer to both the Hospital partnership and HealthSouth Corporation itself, it blurs any distinction between HealthSouth of Sarasota Limited Partnership and HealthSouth Corporation thus, making HealthSouth Corporation a party to the Agreement.

29.    The Medical Direction Agreement required that any notice required or permitted thereunder be sent to both the Hospital *and* to the legal department of HealthSouth Corporation at its Birmingham address, further evidencing the interlocking relationships and control of HealthSouth Corporation over HealthSouth Real Property and the Hospital and that both the Hospital and HealthSouth Corporation were contracting with Plaintiffs.

30.    Under the Medical Direction Agreement, Dr. Simon was obligated to perform certain tasks and assume certain roles, including but not limited to:

a.    Provide medical direction for a Comprehensive Rehabilitation Program, subject to the Hospital's policies and procedures;

b.    Supervise documentation recorded and clinical activities provided by the program;

c.    Develop and implement treatment and clinical programs, modalities, and critical pathways for patients of the program;

d.    Develop, coordinate, and participate in the training of program staff and personnel;

e.    Answer to the Medical Director and Chief Executive Officer of the Hospital with

regard to administrative duties;

    f.  Be available Monday through Friday and on weekends upon the Hospital's request;

    g.  Refrain from hiring any of the Hospital's employees or former employees during the term of the Medical Direction Agreement or for one year thereafter;

    h.  Serve on Hospital and Medical Staff committees at the Hospital's request; and

    i.  Act as a representative of the Hospital to patients, families, practitioners, and other members of the public.

31.    The Medical Direction Agreement also contained restrictive covenants prohibiting Dr. Simon from hiring employees or former employees of the Hospital or any of its affiliates during the term of the agreement or for one year thereafter and from working as a medical director at any other facility within the agreement's service area during the term of the agreement or for four months thereafter.

32.    The Medical Direction Agreement also contained an indemnification provision in which the Hospital and the Hospital's "parent corporation, affiliates, and subsidiaries and their respective directors, officers, employees, agents and representatives agree to indemnify and hold" Dr. Simon harmless from all third party claims related to her work under the Medical Direction Services Agreement. Such "affiliates" would include HealthSouth Real Property and HealthSouth Corporation.

33.    Notwithstanding the language of the Medical Direction Agreement disclaiming same, the above restrictions, prohibitions and obligations show that, in practice, Dr. Simon and Florida Rehab were not only contractors, but employees and/or agents of the Hospital and, in turn, its managing partner, HealthSouth Real Property, and HealthSouth Corporation, by virtue of the execution of the Agreement by Ms. Wilder, a senior corporate officer of HealthSouth Corporation,

and the agreement's terms, and the fact that HealthSouth is referred to in the Agreement interchangeably to include both the Hospital partnership and HealthSouth Corporation itself.

34.    At all times relevant to this action, Dr. Simon was an employee, contractor, and/or agent of the Hospital, HealthSouth Real Property and HealthSouth Corporation.

35.    At all times relevant to this action, Florida Rehab was a contractor and/or an agent of the Hospital, HealthSouth Real Property and HealthSouth Corporation.

36.    Dr. Simon was retaliated against by the Hospital, HealthSouth Real Property and HealthSouth Corporation, beginning in or around March 2008 and thereafter, because she objected to, refused to participate in, and threatened to report to the government HealthSouth Corporation's and the Hospital's violations of the FCA, resulting in her constructive discharge from the hospital in April 2012, three months before HealthSouth Real Property withdrew its authorization to do business in Florida and HealthSouth Corporation allegedly "converted" the limited partnership to a Delaware LLC.

III.    **FACTUAL BACKGROUND**

   A.    **MEDICARE AND MEDICAID PROGRAM REQUIREMENTS**

37.    Therapy and rehabilitative care is an approach to help individuals who are healthy enough for a meaningful recovery and have a reasonable life expectancy.

38.    Therapy and rehabilitative services are provided by HealthSouth's Hospital, which is an In-Patient Rehabilitation Facility (IRF).

39.    In 1965, Congress enacted Title XVIII of the Social Security Act to pay for the cost of certain medical services for persons aged 65 and older, certain persons with disabilities, and persons with kidney failure.

40.     The U.S. Department of Health and Human Services ("HHS") administers the

Supplementary Medical Insurance Program for the Aged and Disabled ("Medicare") through the Centers for Medicare & Medicaid Services ("CMS"), a division of HHS formerly known as the Health Care Financing Administration ("HCFA").

41.     The Medicare program has four parts, two of which are pertinent here: Medicare Part A ("Hospital Insurance Program"), which provides for care in or by institutional providers, *see* 42 U.S.C. § 1395c, *et seq.*; and Medicare Part B ("Supplemental Medical Insurance Program"), which pays for physician services and a variety of outpatient services, such as therapy and rehabilitative care. *See* 42 U.S.C. § 1395j, *et seq.*

42.     In order to participate in the Medicare program, a health care provider must meet the applicable qualifications and enroll in the Medicare Program.

43.     Under Medicare regulations, the term "Provider" means "a hospital, a critical access hospital, a skilled nursing facility, a comprehensive outpatient rehabilitation facility, a home health agency, or a hospice that has in effect an agreement to participate in Medicare, or a clinic, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy or speech pathology services, or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services." 42 CFR § 400.202. HealthSouth is a "Provider" under the Regulations.

44.     Providers such as HealthSouth must comply with the requirements of the Medicare and Medicaid programs in order to be eligible to receive payments from these programs for rehabilitative services.

45.     Section 4421 of the Balanced Budget Act of 1997 (Public Law 105-33) modified how payment is made for IRF services by creating Section 1886(j) of the Social Security Act (the "SS Act"), which authorized the implementation of a per-discharge prospective payment system

13

("PPS") for inpatient rehabilitation hospitals and rehabilitation units of acute care hospitals, such as the IRF operated by HealthSouth.

46.    The amount of the PPS payment the IRF receives for each patient is based on the IRF Patient Assessment Instrument ("PAI"), which contains patients' clinical, demographic and other information, and classifies the patients into distinct groups based on clinical characteristics and expected resource needs. Separate payments are calculated for each group, including the application of case and facility level adjustments.

47.    The IRF PPS includes the following elements:

a.    *Rates*. As required by § 1886(j) of the SS Act, the federal rates reflect all costs of furnishing IRF services (routine, ancillary, and capital related) other than costs associated with operating approved educational activities as defined in 42 C.F.R. §§ 413.75 and 413.85, bad debts, and other costs not covered under the PPS.

b.    *Medical Conditions.* Since May 7, 2004, 42 C.F.R. § 412.29(b)(2) specifies 13 medical conditions that meet the classification criteria for payment under the IRF PPS. They include: stroke, burns, spinal cord injury, major multiple trauma, congenital deformity, amputation, fracture of femur (hip fracture), brain injury, and neurological disorders (including multiple sclerosis), motor neuron disease, polyneuropathy, muscular dystrophy and Parkinson's disease. The SS Act also stipulated that the criteria for these specified comorbidities must continue to be used to determine eligibility.

c.    *Compliance percentage.* Under 42 C.F.R. § 412.29(b)(l), the IRFs must maintain a minimum percentage of the facility's total in-patient population that meet at least one of the medical conditions listed in 42 C.F.R. § 412.29(b)(2), which is known as the "compliance threshold." As of July 1, 2005, the compliance threshold is set at 60%,

which is now referred to as the "60% Rule."

d. *Reasonable and necessary criteria for determining the reasonableness of IRF claims.* Under 42 C.F.R. § 412.622, effective for discharges that occur on or after January 1, 2010, claims for reasonable and necessary services are assessed under criteria which include the key decision points considered and documented when making a decision to admit, retain or discharge an IRF patient; certain preadmission assessment requirements; a post-admission physician evaluation to verify that the beneficiary's preadmission assessment information remains unchanged or to document any changes; and specific requirements for an individualized overall plan of care for each individual.

48.     Among the criteria for determining the reimbursement for admission into the IRF and for the provision of reasonable and necessary therapy and rehabilitative services under 42 § 12.622(3), the IRF must determine that a beneficiary:

a. Needs the coordinated care of multiple therapy disciplines uniquely provided in IRFs, one of which must be physical or occupational therapy;

b. Requires, and can actively participate and benefit from, an intensive rehabilitation therapy program generally consisting of at least 3 hours of therapy per day at least 5 days per week;

c. Is sufficiently medically stable at the time of admission to be able to actively participate in the intensive rehabilitation therapy program and benefit from IRF services; and

d. Requires close medical supervision by a licensed physician, including face-to-face visits with the patient at least 3 days per week, for the management of medical conditions to support participation in an intensive rehabilitation therapy program.

49.     Patients should only be admitted when they meet the criteria specified in the

previous paragraph. When patients are improperly admitted because they do not meet the criteria, and the criteria are falsified in order to qualify for payment of a claim, any such falsification for admission is a precursor to a false claim, and all requests for payment for such patients are false claims under the FCA.

### B.     FALSE CLAIMS ACT

50.     Federal law prohibits knowingly presenting or causing to be presented a false or fraudulent claim for payment from the United States Government. It is unlawful to conspire to defraud the Government by getting a false or fraudulent claim allowed or paid.

51. The FCA, at § 3729, provides in pertinent part that:

(a)     Any person who (1) knowingly presents, or causes to be presented to an officer or employee of the United states Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; ... or (4) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

\* \* \*

*is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person*

\* \* \*

(b)     For purposes of this section, the terms "knowing" and "knowingly" mean that a person without respect to information (1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. §3729.

52.     On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which amended 31 U.S.C. § 3729(a)(l) and (a)(2), which became § 3729(a)(l)(A) and (a)(l)(B), respectively. After the FERA amendments, § 3729(a)(l) currently provides liability for

any person who:

   a.   knowingly presents, or causes to be presented, a false or fraudulent claim for
        payment or approval;

   b.   knowingly makes, uses, or causes to be made or used, a false record or statement
        material to a false or fraudulent claim; or,

   c.   conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
        § 3729(a)(l).

53.    Under the FERA amendments, liability under § 3729(a)(l)(A) or (C) applies to all
conduct by the Defendants which occurred after the date of the FERA enactment, May 20, 2009.
For liability for false claims under § 3729(a)(l)(B), FERA provides that this provision applies
retroactively to all false claims made by the Defendants which were pending on or after the date
of June 7, 2008. False claims in this action pre-date the FERA amendments since they began in
January 2006 and are thus brought under the pre-FERA amendments to the FCA. False claims
continue through at least April of 2012 and thus also fall within the post-FERA amendments.

   **C.    ELIGIBILITY FOR THERAPY AND/OR REHABILITATIVE CARE**

54.    As the 2016 10-K filing states, HealthSouth Corporation and its affiliates and
owned entities, including HealthSouth Real Property and the Hospital were, jointly and severally,
responsible for determining eligibility for admission, participation in the establishment of the Plan
of Care, provision or supervision of therapy or rehabilitative services, periodic review and updating
of the Plan of Care for each individual receiving care, and establishment of policies governing the
day- to-day provisions of services. 42 C.F.R. § 418.68(b). The Medical Director appointed himself
as the approval authority for every admission and, as more fully discussed herein, admits patients
to himself, which is in violation of the Stark Act, 42 U.S.C. § 1395nn (2010) and the Florida
Patients Self Referral Act, § 456.053, Florida Statutes (2010).

55.     Medicare regulations require that a facility maintain a clinical record for each patient. 42 C.F.R. § 418.74.

56.     Each patient's clinical record must contain 1) the initial and subsequent assessments; 2) the Plan of Care; 3) identification data; 4) consent and authorization and election forms; 5) pertinent medical history; and 6) complete documentation of all services and events (including evaluations, treatments, progress notes, etc.). 42 C.F.R. § 418.74(a).

57.     A patient's clinical record must be sufficient to support claims for payment in that it must contain documentation to support the patient's treatment, progress and prognosis. 42 C.F.R. § 418.74.

### D.     THE SCHEME TO DEFRAUD THE UNITED STATES GOVERNMENT

58.     The Defendants did, from at least January 2006 to at least April of 2012, engage in a scheme to fraudulently charge the Medicare and Medicaid programs for therapeutic and rehabilitative services. Specifically, the Defendants routinely and, as a pattern and practice, presented and/or caused to be presented false and fraudulent Medicare and Medicaid claims for payment in violation of 31 U.S.C. § 3729(a) and Florida Statutes § 68.082(2), by knowingly submitting false or fraudulent claims to Medicare and Florida Medicaid for services rendered to patients who were: (1) ineligible for admission into HealthSouth's IRF under the SS Act (see paragraphs 46 through 48 herein); and/or (2) which did not meet professionally recognized standards of health care; and/or (3) submitted claims for payment for therapeutic and rehabilitative services that were being performed by uncertified personnel. In summary, the fraud consists of the following acts committed by HealthSouth Corporation from at least January 2006 through 2012, and on information and belief, through the present date:

a.     The Defendants knowingly and falsely certified patients as eligible to receive

therapeutic and rehabilitative services, when in fact they were not eligible for Medicare and Medicaid reimbursement, in order to falsely inflate the numbers of patients eligible for such benefits to meet the hospital's 60% Rule; and knowingly submitted false claims for payment for such ineligible patients. The false certifications include, but are not limited to, fabricated diagnoses, concealment of a patient's true condition in recording eligible criteria but omitting conditions that would show ineligibility; improperly detaining in the hospital patients whose condition was such that they no longer benefited from IRF services and who thus became ineligible for reimbursement; and falsifying a patient's physical examination to demonstrate criteria for eligibility. In fact, at any given time, at least two-thirds of the average patient population of 70-90 patients in HealthSouth's IRF were ineligible for admission. The Defendants, knowing the ineligibility of the majority of Defendant's patients, conspired to submit and/or submitted to the Government claims for payment of $1,000 per day;

b.  The Defendants also knowingly submitted false claims for payment  by routinely billing for more services than were medically necessary; for example, over-utilization of consulting services, as more fully described in Section (III)(G) below;

c.  The Defendants also knowingly submitted false claims for payment by billing Medicare for services at a higher level than that of the services actually performed; for example, billing for "one-on-one" physical and occupational therapy services when the therapist was servicing multiple patients at the same time, as more fully described in Section (III)(G) below;

d.  The Defendants also knowingly submitted false claims for payment by billing

Medicare for patients who were referred to the Defendants pursuant to an illegal kickback scheme with medical facilities and doctors, as more fully described in Section (III)(F);

e.  The Defendants falsely certified on Requests for Payment for IRF services that the Defendants were in compliance with the federal and state healthcare statutes and regulations, in order to ensure payment by the Government;

f.  The Defendants also knowingly submitted false claims for payment by billing Medicare for "physical and occupational therapy" services performed by unqualified persons, who were neither licensed under state law nor enrolled in or met Medicare requirements for providing therapy. For example, Dr. Simon observed kitchen staff providing physical and occupational therapy, as more fully described in Section (III)(G);

g.  In furtherance of the fraud, the Defendants discriminated against Dr. Simon for her disclosure of and objection to the fraud, her efforts to stop such fraud, her threats to report such fraud to the Government, and her investigation, preparation of, and filing of the instant *qui tam* action on February 3, 2012.

59.    As a result of the Defendants foregoing actions, the Defendants wrongfully obtained tens of millions of dollars from the United States that they were not entitled to receive.

60.    Additionally, the overpayments fraudulently submitted by the Defendants damaged the State of Florida through its Medicare and Medicaid programs.

**E.    ADMITTING AND RETAINING PATIENTS WHO DO NOT QUALIFY FOR MEDICARE SERVICES**

61.    The Defendants have consistently admitted patients who are not eligible for admission under Medicare eligibility criteria and the Act, by (a) falsifying the diagnoses of such

patients to make them appear to the Government to be eligible for admission and reimbursement for IRF services when, in fact, they were not; or (b) if otherwise eligible, to falsely make the diagnoses appear qualifying under the 60% Rule referenced in Paragraph 21(c) of this Complaint. A spreadsheet showing examples of such improperly admitted patients and their false diagnoses was attached to the original complaint as Composite Exhibit 1. Exhibit 1 shows a sampling of patients who were admitted to the Hospital under a "false" diagnosis and were thus ineligible to receive inpatient rehabilitation services from Medicare. The Defendants billed Medicare for rehabilitation services provided to the patients listed in Composite Exhibit 1, despite their ineligibility.

62.     A true myopathy is a muscle disease. The condition of myopathy has widely varying etiologies, including congenital or inherited, idiopathic, infectious, metabolic, inflammatory, endocrine and even drug-induced or toxic. These etiologies that result in myopathy, which have symptoms such as proximal muscle weakness, impaired functions of daily life, and, rarely, muscle pain and tenderness, should properly be coded as ICD-9 Code 359.89.

63.     In order to meet the 60% Rule and boost its profits, HealthSouth Corporation sent out a briefing team from its Alabama headquarters to the Hospital with a PowerPoint presentation that attempted to convince Dr. Simon and other doctors at the hospital that patients could be admitted under a new diagnosis of "disuse myopathy" to be coded and thereby reimbursed as a "myopathy of known etiology" under ICD-9 Code 359.89.

64.     The term "disuse myopathy" was made up out of whole cloth by HealthSouth Corporation. The term is not found in the ICD-9 Code database (which has around 13,000 codes) or the more recently used ICD-10 Code database (which has around 68,000 codes), even though the ICD-10 codes are so extensive that they include very rare and unlikely diagnoses, such as

"struck by an orca, initial encounter" or "sucked into a jet engine."

65.    Notwithstanding that "disuse myopathy" is nowhere found in the Codes, HealthSouth Corporation chose not to verify the presence of an actual autoimmune disease, endocrinopathy, renal insufficiency, or possibly one of several periodic paralyses such as familial hypokalemic periodic paralysis, but instead simply instructed its physicians that if there were common symptoms of myopathy, such as proximal muscle weakness or impaired function in daily life activities, they could admit and should admit under ICD-9 Code 359.89, and record a diagnosis of "disuse myopathy'' as "other myopathies not elsewhere classified." That classification, however, is for myopathies that actually exist, and not for a fraudulent myopathy such as disuse myopathy.

66.    In addition, HealthSouth Corporation told its Clinical Liaisons, who were out in the hospitals and other facilities, to tell social workers and physicians that they would admit patients when other rehabilitative hospitals and facilities refused to admit them. HealthSouth Corporation financially incentivized its Clinical Liaisons to increase the number of patients by using this false diagnosis; and offered lucrative "consultation fees" and fabricated medical directorships to referring physicians.

67.    As stated above, when Dr. Simon refused to admit patients under the false diagnosis of "disuse myopathy," the Medical Director and HealthSouth would send the file to another physician, or to the Medical Director himself, who would admit the patient on this false diagnosis. And, as it did with Dr. Simon, HealthSouth Corporation retaliated against doctors and others who balked at using the false diagnosis of disuse myopathy.

68.    Clinical Liaisons and Staff at HealthSouth have specifically been instructed by HealthSouth Corporation and the Medical Director to admit patients who are not appropriate for

admission under Medicare criteria with the assurances from HealthSouth and the Medical Director that other professional staff would be responsible for obtaining supporting documentation of appropriateness.

69.     As a consequence of the fraudulent diagnoses of disuse myopathy, and other fraudulent diagnoses such as "Parkinsonian exacerbation" and "ataxia," HealthSouth Corporation was able to have its hospital in Sarasota qualify for the 60% Rule, which requires 60% of discharges for a given year to fall into one of thirteen diagnoses (CMS-13) in order to qualify for the prospective payment system, a more lucrative payment model than an acute care hospital receives.

70.     A second way that "disuse myopathy" affects Medicare patients is that Medicare uses a formula largely based on diagnoses and different tiers to estimate the length of stay that a patient will need in a rehab hospital, and it makes a lump-sum payment based on this calculation; that is, a hospital receives more money the longer the length of stay is estimated for its patients.

71.     The Hospital was so widely known in the medical community as a rehab hospital that would admit anyone, irrespective of whether or not the patient would benefit from rehabilitation, as long as the patient had a payor source. The following egregious examples are just some of the cases in which  the Defendants fraudulently admitted patients under the made-up diagnosis of disuse myopathy and, therefore, since these patients could not benefit from rehabilitation, HealthSouth billed the Government for rehabilitation that was not "medically necessary:"

    a.  *Patient V*. Patient V was admitted first on June 24, 2010 by Dr. Alexander DeJesus as an 81-year-old with "progressive weakness," inability to ambulate, and knee abrasions. Dr. Simon's review of the patient's History and Physical/Post Admission

Physician Evaluation ("H&P") and actual assessment reveals that the patient was a severe alcoholic. He was discharged on July 8, 2010 after it was noted that he had no problem walking (due, of course, to his now being sober). Patient V was re-admitted again on May 8, 2011, when EMS arrived at his home to find him drunk. He was retained until May 26, 2011. To make him appear eligible for admission and reimbursement under Medicare, Dr. DeJesus gave him an admission diagnosis of "disuse myopathy."

b. *Patient R*. Dr. Simon reviewed Patient R's H&P and has first-hand knowledge of this Patient's condition. Patient R was paralyzed below the waist due to an inoperative cancerous mass on his spinal cord. He was admitted at HealthSouth on September 27, 2011 for inpatient rehabilitation. His records showed that the cancer had metastasized and had traveled into his kidneys. His condition was terminal and he was therefore ineligible for rehabilitation. His Plan of Care, however, included physical therapy for three hours a day, five days a week, the required minimum for Medicare reimbursement, in order to have him gain "full weight bearing status" in his "lower extremities," an impossibility given the inoperative tumor on his spine. On October 17, 2011, Dr. Daniel Hume noted in the H&P that the patient's prognosis was "good to achieve these results," which was a medical impossibility.

c. *Patient D*. Dr. Simon reviewed Patient D's H&P and has first-hand knowledge of his condition. Patient D was a 93-year-old who had prostate cancer which had metastasized. He was clearly ineligible for rehabilitation due to his imminent terminal diagnosis and died 16 days after being admitted by Dr. DeJesus into the hospital on October 1, 2011, with a false diagnosis of "disuse myopathy." Dr. DeJesus noted in

the H&P that Patient D was being admitted for "comprehensive inpatient rehabilitation." After the hospital received 16 days of improper reimbursement for Patient D, hospice was finally consulted on October 17, 2011, the day Patient D died.

72.    On information and belief, HealthSouth billed Medicare for rehabilitation services for Patients V, R and D, despite their ineligibility for admission under Medicare regulations.

73.    Dr. Simon estimates that at least 66% of the daily patient census admitted to HealthSouth's hospital were not qualified for admission under Medicare criteria. The daily patient census has changed during the relevant period from 35 patients in January 2006 to 86-90 patients in October 2011, even though the population of Sarasota has not significantly increased and the admission criteria became more restrictive.

74.    At least beginning in January, 2006, the Defendants obtained payment from Medicare for, on average, 40 ineligible patients a day at $1,000 a day or $14.6 million a year.

75.    The Defendants have also routinely delayed patient discharges in order to continue billing their fraudulent charges to Medicare by intentionally prolonging the process of determining whether a patient no longer requires care in order to inflate their charges to Medicare or benefit from receiving the entire payment designated by diagnosis code by artificially prolonging medically unnecessary hospital stays. For example, Dr. Simon knows that some patients who should be immediately referred to a Skilled Nursing Facility ("SNF") or Acute Care Facility ("ACF") or a Hospice are retained in the hospital for the maximum time to ensure that HealthSouth obtains the maximum amount from Medicare based on number of days in the hospital.

76.    The Defendants also have engaged in a fraudulent scheme to bill Medicare and Medicaid for internal medicine, pulmonology, psychological, psychiatric, and similar consultation services that were over utilized and medically unnecessary. A spreadsheet of examples of

unnecessary consults showing Medical Record Number, Date and Type of Consultation, etc., attached as Composite Exhibit 2 to the original complaint. Dr. Simon has personal knowledge of the patients listed in Composite Exhibit 2 and the medically unnecessary nature of each of the consults for these patients. Additionally, Dr. Simon is aware that the Hospital's Medical Director orders or ordered multiple consultations for virtually every patient he admitted for rehabilitation at the Hospital under his care.

77.    In some cases, and as more fully described herein, the Defendants use the frequent billing and reimbursement of consultation services as an incentive to doctors outside the hospital to refer ineligible patients to the Hospital and its Medical Director.

78.    The Defendants earn their income from the provision of therapeutic and rehabilitative services, and their fraudulent and deceitful scheme intentionally caused the payment of Medicare claims which were false or fraudulent in order to enrich themselves.

79.    Dr. Simon gained direct and independent knowledge of the above-mentioned false claims by working as a Program Medical Director for the Hospital's spinal cord injury program. Her knowledge was gained by actual observation and experience at the Hospital, including knowledge gained by talking with other staff members employed at the Hospital and in a review of medical records she was authorized to access or that were readily accessible.

F.    **PATIENT BROKERING: ESTABLISHING ILLEGAL KICKBACK SCHEMES IN ORDER TO INCREASE REFERRALS**

80.    Starting before June of 2008, in order to elicit increased referrals from medical facilities and doctors, the Defendants provided referring physicians with the opportunity to be reimbursed by Medicare for improper and medically unnecessary consultations in violation of the Medicare Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, Florida's Patient Brokering Statute, § 817.505(a)(a) and the Stark Law, 42 U.S.C. § 1395nn. In other words, referring physicians know

that patients they refer will be improperly admitted to the Hospital, and that the referring doctors will, in turn, receive back from HealthSouth and its Medical Director medically unnecessary consultations for which they can and do bill Medicare as a way to conceal what is, in reality, an illegal kick-back fee.

81.     The Defendants have offered kickbacks in the form of these medically unnecessary consult fees to incentivize illegal referrals in violation of the above-referenced statutes. These consultations performed by referring doctors, specifically including doctors from the Intercoastal Medical Group, were not commercially reasonable and did not further the business purpose of HealthSouth, since the consultations were not medically necessary and performed on patients improperly admitted.

82.     The Defendants violated the Anti-Kickback Statute and Stark Laws; and thus resulted in the knowing submission of false claims for reimbursement from Medicare for patients referred under an illegal kickback scheme since, under the Patient Protection and Affordable Care Act ("PPACA"), a violation of the Anti-Kickback Statute is a false claim and Florida's statute prohibits such acts outright.

83.     A spreadsheet of examples of the illegal referrals/consultations was attached as Composite Exhibit 4 to the original complaint. The patients listed in Exhibit 4 were patients in which the referring doctor was also retained by the Hospital to perform a consult. The consults were not medically necessary and the patients in this Exhibit were not eligible to receive rehabilitation services under Medicare. On information and belief, Defendants billed Medicare and received payment for the rehabilitation and consultation services for the patients identified in Composite Exhibit 4.

**G.      PROVIDING IMPROPER STAFFING AND UNLICENSED PROVIDERS**

84.     The Defendants knowingly provided inadequate staffing levels for its patients and

27

has consistently allowed unlicensed individuals to provide patient care.

85.    For example, the Defendants allowed non-medical staff to provide medical services to patients, including several instances observed by Dr. Simon in which kitchen staff provided group physical therapy to patients. These instances of kitchen staff providing group therapy occurred between 2006 and 2008, and the Defendants fraudulently billed Medicare for individual physical therapy by a licensed therapist for these patients who instead received group therapy from kitchen staff.

86.    Additionally, between January 2006 through 2012, and on information and belief through the present day, Defendants routinely provided "group" therapy to patients, rather than individual therapy as required by Medicare regulations. Dr. Simon witnessed these sessions multiple times in 2011 where one physical therapist provided therapy to a group of patients at one time. Defendants fraudulently billed Medicare for reimbursement for individual therapy for these patients, falsely certifying that they received individual therapy.

87.    Finally, Defendants knowingly allowed unlicensed therapy students to provide hands-on treatment to patients without the supervision of a licensed provider. Specifically, Defendants routinely allowed unlicensed physical therapy students to provide therapy to patients without the supervision by a licensed therapist. Dr. Simon has observed this practice on multiple occasions in the years between 2007 and 2012 and has personal knowledge that Defendants billed Medicare for these patients for therapy performed by a licensed provider.

88.    Dr. Simon has engaged the undersigned attorneys to represent her interests and said attorneys are entitled to a reasonable fee for their services.

**COUNT I: RETALIATION CLAIM PURSUANT TO 31 U.S.C. § 3730(h) AGAINST ENCOMPASS HEALTH REHABILITATION HOSPITAL OF SARASOTA, LLC**

89.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 88.

90.     This is an action pursuant to 31 U.S.C. § 3730(h).

91.     At all times relevant to this action, Dr. Simon was not only a contractor for, but an employee and/or agent of the Hospital; and Florida Rehab was not only a contractor but an agent of the Hospital.

92.     Dr. Simon, individually and through Florida Rehab, has acted lawfully in furtherance of an action under Section 3730 and has made other efforts to stop one or more violations of 31 U.S.C. Chapter 37, Subchapter III, which acts are protected under Section 3730(h). Such protected activities include, but are not limited to:

a.   Multiple times between early 2008 and her constructive discharge in 2012, Dr. Simon objected to and threatened to report to the Government the practices of the Hospital in falsifying the diagnoses of patients so they could be admitted and/or qualify under the 60% Rule. Dr. Simon's objections and threats to report such behavior included, but were not limited to:

i.   Reporting to the Hospital's CEO (first Dan Eppley ("Eppley"), and later Marcus Braz ("Braz")) during several in-person meetings that the Hospital's practice, at the direction of HealthSouth Corporation, of inappropriately coding patients' diagnoses as disuse myopathy, Parkinsonian exacerbation, ataxia, or other false diagnoses constituted fraud on the Government or Medicare fraud, that she would not make such fraudulent diagnoses, and that she may need to report the practice to the Government.

ii.  During multiple monthly in-person meetings she attended with Dr. Alexander DeJesus (the Hospital's Medical Director), other Hospital physicians, and the Hospital CEO, stating that she refused to admit patients under disuse myopathy,

Parkinsonian exacerbation, ataxia, or other diagnoses if such a diagnosis was
unsupported and that doing so would be lying in medical records, and would
constitute fraudulent activity and making false claims to the Government.

iii.  During a presentation in which HealthSouth Corporation representatives from the
corporate office in Alabama explained in detail how to falsely document disuse
myopathy, Parkinsonian exacerbation, ataxia, and other diagnoses, and at which
representatives of the Hospital were present, Dr. Simon publicly objected to the
practice and stated to representatives of the Hospital and HealthSouth Corporation
that it constituted fraud. Immediately after that presentation, Dr. Simon repeated
these comments to Braz one-on-one.

iv.  On several phone calls and in-person discussions with Marketing Director Nancy
Arnold ("Ms. Arnold"), during which Ms. Arnold directed Dr. Simon to falsely
document a diagnosis of disuse myopathy, telling Ms. Arnold that it would be
fraud to document disuse myopathy if that was not the patient's condition, she
refused to say anything untrue in a patient's medical records, and doing so was
stealing from the government;

v.  Telling Dr. DeJesus in several face-to-face conversations that using the disuse
myopathy, Parkinsonian exacerbation, ataxia, or another false diagnosis for
patients who did not have the condition was a fraudulent billing practice.

vi.  In multiple phone calls with the Hospital's admissions liaisons who directed Dr.
Simon to falsely document disuse myopathy, Parkinsonian exacerbation, ataxia,
or other false diagnoses, Dr. Simon told the admissions liaisons that it would be
fraud if she did so, and if the Hospital's practice of falsely coding disuse myopathy

and other diagnoses continued, she would have to report it to the Government.

b. Multiple times between 2008 and her constructive discharge in 2012, Dr. Simon objected to and threatened to report to the Government the Hospital's and HealthSouth Corporation's practices of routinely overbilling hours, billing for medically unnecessary procedures, and calling for unnecessary consultations in order to fraudulently claim Medicare reimbursements. Dr. Simon's objections and threats to report such behavior included, but were not limited to:

i. Reporting multiple times to the Hospital's CEO, risk managers, the Hospital's Medical Director that the Medical Director's kickback arrangement with referring physicians, whereby the referring physicians would send patients to be improperly admitted at the Hospital and in exchange Hospital physicians would seek unnecessary consults with referring physicians and bill such consults to Medicare, constituted fraud on the Government which Dr. Simon indicated she may have to report.

ii. Complaining multiple times to the Hospital's CEO, other Hospital physicians, and to the Medical Director himself that the practice of seeking unnecessary consults for patients in order to be able to bill the consults to Medicare constituted fraud on the Government, which Dr. Simon indicated she may have to report.

iii. Complaining many times to the Hospital's CEO and risk managers that the Medical Director and other physicians were billing for medically unnecessary services, which was fraud on the Government and which Dr. Simon indicated she would report to the Government.

iv. Reporting to the Hospital's Medical Executive Committee and the Hospital's

Medical Director that the Medical Director was billing such an excessive number of hours that it was impossible for his billing numbers to be true, and that submitting inflated billable hours to the Government constituted fraud. The Medical Director did not deny that he was overbilling but tried to justify doing so.

c. Multiple times between 2008 and 2011, Dr. Simon objected to the Hospital's practice, at the direction of HealthSouth Corporation, of incorrectly billing therapy sessions to Medicare. Dr. Simon's objections included, but were not limited to:

i. Complaining to the head of the Therapy Department and Hospital risk management that she had observed members of the kitchen staff leading group therapy sessions, and billing that to Medicare was fraud on the Government.

ii. Complaining to the head of the Therapy Department that patients who had attended group therapy sessions were being certified as having attended individual therapy sessions (which command a higher reimbursement rate), and that falsely billing Medicare for individual therapy sessions was fraud on the Government.

iii. Complaining to members of the Therapy Department that unlicensed, unsupervised therapy students had been conducting therapy sessions.

93.     Dr. Simon, individually and on behalf of Florida Rehab, followed through with her threats to report the Hospital's and HealthSouth Corporation's fraudulent activity. She investigated, prepared, and then filed the instant *qui tam* action on February 3, 2012.

94.     The Hospital and HealthSouth Corporation were aware that Plaintiffs were engaging in protected activity; in fact, as described above, Dr. Simon openly discussed much of her protected activity with representatives of the Hospital, and she objected to the practices directly to representatives of HealthSouth Corporation when they presented the corporate briefing.

95.     The Hospital, for itself and as the agent of HealthSouth Corporation, harassed, demoted, and engaged in other discriminatory and retaliatory conduct against Plaintiffs, from at least March 2008 through Dr. Simon's constructive discharge in 2012, because of their aforesaid protected activities, in ways including but not limited to the following:

a.  In or around March 2008, the Hospital's Medical Director physically cornered Dr. Simon near the Nursing Station, verbally assaulting and threatening Dr. Simon because she refused to admit a patient with a false diagnosis. Dr. Simon maintained her refusal during the confrontation, telling the Medical Director that it would be defrauding the Government to document and admit a patient using a false diagnosis. The Medical Director then threatened her job, saying he could "destroy" her and telling her to remember what had happened to a previously employed physician (Dr. Kevin McGaharan) whom the Medical Director had pushed out. This incident took place in the presence of Isabella Polivchak, physical therapist, and Cindy Tyler, registered nurse.

b.  The Medical Director repeatedly threatened Plaintiffs' job by reminding Dr. Simon "what [he] did to Dr. McGaharan" and telling her if she kept pushing, she would be "out of here."

c.  The Hospital's Marketing Director also threatened Plaintiffs in response to Dr. Simon's protected activities by telling Dr. Simon "You better do it [engage in fraudulent billing practices as directed] or things will start happening," and "You are playing with fire. You are the little person; you have to do what you're told, or things will start happening."

d.  On September 25, 2009, a Dr. Geoffrey Kanter complained to the Hospital's Medical

Director, Dr. DeJesus, that Dr. Simon refused to agree to medical consultations for patients referred to the Hospital which, Dr. Kanter notes, Dr. Simon stated were fraudulent. These were allegations that, according to Dr. Kanter, she had made before.

e.  In 2009, and in retaliation for Plaintiffs' ongoing objections to the Hospital's and the Medical Director's fraudulent billing and documentation practices, the Medical Director, as an agent of the Hospital and HealthSouth Corporation, demoted Dr. Simon by having her removed from the Medical Executive and Credentialing Committee and removing her from her position as Medical Chief of Staff.

f.   In or around March 2010, after a patient of Plaintiffs' developed a pressure sore as a result of insufficient nursing care stemming from inadequate staffing, Hospital CEO Eppley summoned Dr. Simon for an emergency meeting, refusing to tell Dr. Simon what the meeting was about. Dr. Simon appeared for the meeting accompanied by an attorney. Upon seeing the attorney, Eppley left the room to confer with the Medical Director; more than an hour later, and on information and belief, conferring with HealthSouth's Legal Department, Eppley returned and called off the meeting with Dr. Simon. Eppley called this meeting to intimidate Plaintiffs because of Dr. Simon's ongoing objections to the Hospital's and HealthSouth Corporation's fraudulent billing and documentation practices.

g.  In or around November 2010, the Hospital's then-new CEO Braz revoked Dr. Simon's admitting privileges, only allowing her to admit patients whose referring physicians would give Dr. Simon letters of permission to admit their patients.  Braz did not tell Dr. Simon why he was doing this, telling her "I don't have to explain anything to you." The Hospital, for itself and as an agent of HealthSouth Corporation, imposed

these restrictions on Dr. Simon in retaliation for her protected activities and with the intent to significantly reduce her patient load and force Dr. Simon to resign. As a result of these restrictions, Plaintiffs' patient load was cut by more than half.

h.  On or around November 19, 2010, Braz, Dr. DeJesus, and other members of Hospital management met with Dr. Simon and told her that the Hospital would be launching a formal, 6-month investigation into a scrivener's error that had appeared, and been corrected, in one of Dr. Simon's patient charts. The Hospital informed Dr. Simon that the severe restrictions on her admitting privileges would remain in place. Dr. Simon asked Dr. Gabriel, head of the Medical Executive Committee, whether the meeting and investigation were because of Dr. Simon's protected activity regarding HealthSouth's fraudulent billing and documentation practices, and Dr. Gabriel did not deny it.

i.  In late 2010, in further retaliation for her protected activities, the Hospital, pursuant to HealthSouth Corporation's directives that all physicians at the Hospital fraudulently bill the Government, demoted Dr. Simon by removing her from her Program Medical Director position, the position she held pursuant to the Program Medical Director Agreement signed by HealthSouth Corporation's Executive Vice President, Ms. Wilder.

j.  During the Hospital's 6-month investigation, in retaliation for her protected activities and as a further effort to force Dr. Simon to resign, Dr. DeJesus began ordering the Hospital's admitting liaisons to put the name of patients' primary care physicians on the admissions paperwork (rather than the physicians who referred those patients to Dr. Simon), which would prevent those patients from being seen by Dr. Simon even

if Dr. Simon had a permission letter from that referring physician.

k.  In 2011, in further retaliation for her protected activities, the Hospital, pursuant to HealthSouth Corporation's directives that all physicians at the Hospital fraudulently bill the Government, demoted Dr. Simon again by removing her from her position on the Pharmacy and Therapeutics Committee.

l.  After the end of the 6-month investigation, during which the Hospital found no evidence of wrongdoing by Dr. Simon, the Hospital did not lift the restrictions on Plaintiffs' admitting privileges. In fact, in another act of retaliation for Dr. Simon's protected activities, the Hospital forced Dr. Simon to revoke all of her permission letters. As a result, a referring physician had to specifically put Dr. Simon's name on each patient's referral, or the patient would be assigned to Dr. DeJesus. These restrictions humiliated Dr. Simon, and drastically reduced Plaintiffs' patient load. Plaintiffs' patient load dropped to 2 patients, reducing their income to a fraction of its previous amounts.

m.  In or around April 2011, Dr. DeJesus told Dr. Simon that he would no longer cover her patients on weekends, forcing Dr. Simon to work or be on call seven days a week.

96.    The cumulative effect of these and other retaliatory actions by the Hospital and HealthSouth Corporation constitute a constructive discharge of Plaintiff.

97.    But for Plaintiffs' protected activities as described above, the Hospital and HealthSouth Corporation would not have engaged in retaliatory and discriminatory actions against Dr. Simon, including but not limited to those listed above.

98.    By virtue of this discrimination, Plaintiffs have suffered damages.

    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against the

Hospital as follows:

    a.  That Plaintiffs be awarded compensation for the retaliatory, discriminatory actions taken violation of 31 U.S.C. § 3730(h) in the following amounts:

        1.  lost compensation based on the same seniority status as Dr. Simon would have had but for the discrimination;

        2.  two times the amount of back pay;

        3.  interest on the back pay; and,

        4.  compensation for the special damages sustained as a result of the retaliation and discrimination, including emotional distress damages, litigation costs and reasonable attorneys' fees;

    b.  That Plaintiffs be awarded legal fees and costs pursuant to 31 U.S.C. §§ 3730(d) and (h);

    c.  That this Court award such other and further relief as it deems proper.

## COUNT II: RETALIATION CLAIM PURSUANT TO 31 U.S.C. § 3730(h) AGAINST HEALTHSOUTH CORPORATION, n/k/a/ ENCOMPASS HEALTH CORPORATION

99.    Plaintiffs re-allege and incorporate by reference paragraphs 1–88 and 92–97.

100.    This is an action pursuant to 31 U.S.C. § 3730(h).

101.    At all times relevant to this action, Dr. Simon was not only a contractor, but an employee and/or agent of the Hospital and HealthSouth Corporation. At all times relevant to this action, Florida Rehab was a contractor and/or agent of the Hospital and HealthSouth Corporation.

102.    HealthSouth Corporation fixed the Medical Staff Bylaws and Governing Body Bylaws to which the Hospital and Plaintiffs were subject.

103.    HealthSouth Corporation sent representatives to the Hospital to train Hospital physicians and staff on how to submit such false claims by, among other things, recording false or

otherwise unsupported diagnoses such as disuse myopathy.

104.    HealthSouth Corporation participated in the enforcement of such policies by, among other things, offering financial incentives to Hospital staff who engaged in such activities.

105.    HealthSouth Corporation maintained control over Plaintiffs' engagement, discharge, and payment and participated in the investigation of Dr. Simon's complaints and grievances.

106.    HealthSouth Corporation entered into the Physician Recruitment Agreement.

107.    Under the terms of the Physician Recruitment Agreement, HealthSouth Corporation required Plaintiffs to work forty hours per week within a service area and on the Hospital's premises; comply with numerous bylaws, policies, and procedures; refrain from subcontracting services without consent; and participate on committees at the Hospital's request.

108.    HealthSouth Corporation set Hospital policies to which Plaintiffs were subject regarding, among other things, admissions and billing policies.

109.    Specifically, HealthSouth Corporation, directly through its employees sent to the Hospital, directed physicians and staff at the Hospital to submit false claims to Medicare for, among other things, inaccurate diagnoses; medically unnecessary procedures, consultations, and admissions; misclassified therapy sessions; and inflated hours; and engage in other fraudulent billing and document practices.

110.    Under the Physician Recruitment Agreement and the Program Medical Direction Services Agreement, Dr. Simon and Florida Rehab were bound to and under the control of HealthSouth Corporation and were employees, agents and/or contractors of the Corporation.

111.    Plaintiffs engaged in protected activity within the meaning of 31 U.S.C. § 3730(h) by objecting to and refusing to engage in these policies and practices many times, including at

least once at a presentation by HealthSouth Corporation representatives.

112.   Because of Plaintiffs' protected activity, the Hospital, pursuant to HealthSouth Corporation's policies and with HealthSouth Corporation's actual or constructive knowledge, engaged in discriminatory activity against Plaintiffs.

113.   But for Plaintiffs' protected activities, the Hospital (with HealthSouth Corporation's actual or constructive knowledge) would not have engaged in retaliatory and discriminatory actions against Plaintiffs.

114.   By virtue of this discrimination, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against HealthSouth Corporation as follows:

    a.   That Plaintiffs be awarded compensation for the retaliatory, discriminatory actions taken in violation of 31 U.S.C. § 3730(h) in the following amounts:

        1.   Lost compensation based on the same seniority status as Dr. Simon would have had but for the discrimination;

        2.   Two times the amount of back pay;

        3.   Interest on the back pay; and

        4.   Compensation for the special damages sustained as a result of the retaliation and discrimination, including emotional distress damages, litigation costs, and reasonable attorneys' fees;

    b.   That this Court award legal fees and costs pursuant to 31 U.S.C. §§ 3730(d) and (h);

    c.   That this Court award such other and further relief as it deems just and proper.

## COUNT III: RETALIATION CLAIM PURSUANT TO 31 U.S.C. § 3730(h) AGAINST HEALTHSOUTH REAL PROPERTY HOLDING, LLC

115.    Plaintiffs re-allege and incorporate by reference paragraphs 1–88 and 92-97.

116.    This is an action pursuant to 31 U.S.C. § 3730(h).

117.    At all times relevant to this action, HealthSouth Real Property was a Delaware limited liability company.

118.    At all times relevant to this action, HealthSouth Real Property was a general partner of the Hospital, which was a limited partnership organized under Alabama law.

119.    Pursuant to Ala. Code § 10A–9A–4.04, HealthSouth Real Property is liable jointly and severally for all debts, obligations, and liabilities of the Hospital.

120.    Pursuant to Ala. Code § 10A–9A–6.05(b), HealthSouth Real Property's joint and several liability for the Hospital's debts, obligations, and liabilities was not discharged by HealthSouth Real Property's dissolution, if true. After the commencement of this action, HealthSouth Real Property was allegedly dissolved.

121.    Also, pursuant to Del. Code. tit. 6, § 18-804(b), HealthSouth Real Property was required, prior to or at dissolution, to pay or make provision sufficient to provide compensation for potential claims the facts of which it had knowledge of at the time of its dissolution. HealthSouth Real Property had knowledge of the facts that such claims would be made within ten (10) years of its dissolution.

122.    There is nothing in the corporate records of HealthSouth Real Property that it made any such provision for any such potential claims before dissolution.

123.    Plaintiffs were contractors and employees and/or agents of the Hospital, HealthSouth Real Property's limited partner.

124.    HealthSouth Real Property, on behalf of the Hospital, entered into the Medical

Direction Agreement with Dr. Simon.

125.   Plaintiffs engaged in protected activity within the meaning of 31 U.S.C. § 3730(h).

126.   The Hospital engaged in discriminatory activity against Plaintiffs within the meaning of 31 U.S.C. § 3730(h).

127.   But for Plaintiffs' protected activities, the Hospital would not have engaged in such discriminatory activity.

128.   Because of the Hospital's actions, Plaintiffs were damaged.

129.   The Hospital, and HealthSouth Real Property as the general partner, are jointly and severally liable for Plaintiffs' damages.

130.   HealthSouth Real Property is required to pay or make provisions for compensation of Plaintiffs' claims.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against HealthSouth Real Property as follows:

a.   That Plaintiffs be awarded compensation for the retaliatory, discriminatory actions taken in violation of 31 U.S.C. § 3730(h) in the following amounts:

1.   Lost compensation based on the same seniority status as she would have had but for the discrimination;

2.   Two times the amount of back pay;

3.   Interest on the back pay;

4.   Compensation for the special damages sustained as a result of the retaliation and discrimination, including emotional distress damages, litigation costs, and reasonable attorneys' fees;

b.   That this Court award legal fees and costs pursuant to 31 U.S.C.

§§ 3730(d) and (h).

   c.   That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

      Dr. Simon and Florida Rehabilitation Associates, PLLC demand a jury trial on all claims alleged herein.

Respectfully submitted,

/s/ *John S. Vento*
JOHN S. VENTO
Florida Bar No. 0329381
jvento@trenam.com / jyarnell@trenam.com
JACQUELINE M. PRATS
Florida Bar No. 0118862
jprats@trenam.com / lvalente@trenam.com
MARISSA K. ELORDI
Florida Bar No. 1017977
melordi@trenam.com / pbs@trenam.com
TRENAM, KEMKER, SCHARF, BARKIN,
O'NEILL & MULLIS, P.A.
101 E. Kennedy Blvd., Ste. 2700
Tampa, Florida 33602
Telephone: (813) 223-7474
Facsimile: (813) 229-6553
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that the foregoing **Third Amended Complaint and Demand for Jury Trial** has been electronically filed on January 10, 2020 with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing and copy to the parties and counsel of record.

/s/ *John S. Vento*
Attorney