UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

EMESE SIMON and
FLORIDA REHABILITATION
ASSOCIATES, PLLC,

    Plaintiffs,

v.                              Case No. 8:12-cv-236-VMC-AEP

HEALTHSOUTH OF SARASOTA
LIMITED PARTNERSHIP, et al.,

    Defendants.
_____/

### ORDER

This matter comes before the Court upon consideration of Defendants Encompass Health Rehabilitation Hospital of Sarasota, LLC, HealthSouth Real Property Holdings, LLC, and HealthSouth Corporation's Motion for Summary Judgment (Doc. # 209) and Plaintiffs Emese Simon and Florida Rehabilitation Associates, PLLC's Motion for Partial Summary Judgment (Doc. # 214), both filed on November 17, 2020. All parties have responded (Doc. ## 232, 233) and replied (Doc. ## 245, 247). For the reasons that follow, Defendants' Motion is granted, and Plaintiffs' Motion is denied.

### I.  Background

This is a False Claims Act ("FCA") retaliation case brought by Dr. Simon and Florida Rehabilitation Associates,

PLLC against Defendants. Plaintiffs allege that Dr. Simon complained to Defendants about alleged fraud Defendants committed, including the use of the allegedly false diagnosis of disuse myopathy ("DM") and other diagnoses by HealthSouth physicians and other fraudulent practices. Allegedly as a result of her complaints, Dr. Simon faced various adverse employment actions and was constructively discharged.

### A. HealthSouth Sarasota and IRFs

Defendants (collectively "HealthSouth") operate a for-profit inpatient rehabilitation facility ("IRF") in Sarasota, Florida. (Doc. # 212 at 19:4-25; Doc. # 211 at 52:3-6). For an IRF claim to be paid by the government for Medicare and Medicaid claims, there must be a "reasonable expectation" at the time of admission that the patient meets IRF "coverage criteria." 42 CFR § 412.622(a)(3). The "coverage criteria" generally require that the patient (1) can "reasonably be expected to actively participate in, and benefit from, an intensive rehabilitation therapy program," and (2) requires "physician supervision by a rehabilitation physician." Id. The government also requires documentation of a preadmission screening and concurrence of the rehabilitation physician with that screening. 42 CFR § 412.622(a)(4).

The government has made clear that IRF admission "requires a level of physician judgment that cannot be delegated to a physician extender." (Doc. # 209-4 at 2; Doc. # 211 at 55:12-56:18, 61:11-23, 63:25-64:16; Doc. # 213 at 62:5-16, 67:18-68:21).

In addition, to be classified as an IRF, a hospital must serve an "inpatient population of whom at least 60 percent required intensive rehabilitation services for treatment of one or more of [13 specific] conditions [the "CMS 13"]" (or who have a qualifying comorbidity). 42 CFR § 412.29(b)(1); 42 CFR § 412.622(a); see also (Pl. Depo. Doc. # 210-1 at 231:21-232:2; Doc. # 212 at 19:4-25). The government bases CMS 13 compliance, in part, on the IRF's submission of codes known as the ICD-10-CM (previously ICD-9) codes. See (Doc. # 209-3); see also 42 CFR §§ 412.622(a), 412.624(c)(5), 412.620. The government first reviews "impairment group codes [IGC] that meet the presumptive compliance criteria" and if the correct IGC code is identified (along with other factors), then the government may not rely on ICD diagnosis codes on the applicable IRF-PAI for the purpose of presumptive compliance. See (Doc. # 209-5 at 7).

### B.    Dr. Simon and Florida Rehabilitation

Dr. Simon is a physiatrist who operated an outpatient medical practice through her company, Florida Rehabilitation Associates, in the Sarasota, Florida area. (Pl Dep. Doc. # 210 at 16:6-17:22, 170:2-3). Dr. Simon was also an attending physician with admitting privileges at HealthSouth Sarasota Hospital and had an independent contractor agreement with HealthSouth. (Id. at 15:12-19, 19:20-20:7, 26:21-27:14, 32:14-23, 55:8-56:9).

HealthSouth Sarasota's bylaws give the CEO the "sole authority regarding the process of how patients are assigned." (Doc. # 212 at 70:11-14, 79:18-80:1; Doc. # 212-1 at 213:19-214:9; Doc. # 212-9 at Ex. 28 at Sect. IV.2-2). When Dr. Simon began working at HealthSouth Sarasota, the responsibility of assigning patients to admitting physicians had been given to the Medical Director, Dr. Alexander DeJesus, and the admissions department. (Doc. # 211 at 37:16-25). From March 2006 until around October or November 2010, the practice at HealthSouth Sarasota was for Dr. Simon to be assigned all unassigned patients from Manatee County and areas "north of the hospital," and Dr. DeJesus to be assigned all other unassigned patients – particularly those in Sarasota and Lee Counties. (Pl. Dep. Doc. # 210 at 56:14-20, 57:3-20, 154:19-

155:2; Pl. Dep. Doc. # 210-1 at 225:1-5; Doc. # 211 at 71:21-72:21; Doc. # 212-1 at 258:5-9).

During her time with HealthSouth, Dr. Simon wrote two letters complaining about the distribution of patients. In June 2008, Dr. Simon wrote a letter to Linda Wilder, HealthSouth Sarasota's Regional President, in which she suggested, among other things, that the hospital "[d]iscontinue the present practice of patient referrals and admissions to attending physiatrist determined by the patient's geographical location." (Doc. # 216-2 at Ex. 6). The June 2008 letter also recounts an unpleasant conversation Dr. Simon had with HealthSouth Sarasota's other physiatrist, Dr. Alexander DeJesus, regarding the geographic distribution of patients. (Id.).

Years later, in January 2011, Dr. Simon wrote another letter — this time to HealthSouth Sarasota's Medical Executive Committee ("MEC") — also recounting the 2008 conversation with Dr. DeJesus and another phone conversation with Dr. DeJesus. (Doc. # 210-8 at Ex. 50 at SIMON 000322). In this letter, Dr. Simon reported that Dr. DeJesus had "threatened [her] 'not to ever challenge this geographical distribution of [Dr. DeJesus's] practice.'" (Id.).

Significantly, the geographic distribution of patients is not the basis of Dr. Simon's alleged complaints of FCA violations. Neither letter mentioned the alleged frauds Dr. Simon predicates this case upon — the use of the DM diagnosis or other allegedly false diagnoses and other fraudulent practices. Dr. Simon averred that she did not mention "any fraud, false diagnoses or false billing to the government" in any letter because she "thought it best to avoid putting the topic in writing to help preserve [her] position at HealthSouth Sarasota for financial reasons." (Doc. # 236-7 at 2).

Although Dr. Simon admits she never complained in writing about alleged fraud, she maintains she made numerous verbal complaints. Specifically, according to her declaration, Dr. Simon — between 2008 and 2012 — "made numerous complaints about the use of false diagnoses to ensure that patients who were unfit physically were nonetheless admitted to HealthSouth Sarasota." (Id.). She made these verbal complaints in meetings with Dan Eppley (the CEO of HealthSouth Sarasota until summer 2010) and then Marcus Braz (the next CEO), informing them that "the improper use of the codes for [DM], Parkinsonian exacerbation, or ataxia amounted to fraud." (Id.). She also told Eppley and other executives

6

that "physicians had sought unnecessary consults and billed for medically unnecessary procedures." (Id.). Dr. Simon avers she told Dr. Alexander DeJesus "that using false diagnoses for patients was fraudulent." (Doc. # 236-7 at 3).

Furthermore, she "publicly objected" to a March 2010 presentation on DM provided by HealthSouth. (Id. at 2-3). During this presentation, Lupe Billalobos, HealthSouth's former National Healthcare Information Management Director, West, discussed disuse myopathy. (Pl. Dep. Doc. # 210-1 at 210:13-211:3; Doc. # 221 at 19:1-16, 20:19-21:1). As part of her job duties, Billalobos made presentations at HealthSouth Sarasota and other hospitals. In those presentations, Billalobos educated physicians on how to document the diagnoses they chose so that coders could accurately code them. (Doc. # 221 at 32:8-22, 39:22-40:8, 99:8-101:16, 114:1-13, 151:4-153:11, 162:6-19, 172:14-173:22, 178:9-180:12; Doc. # 212  at 149:20-150:7, 163:11-24; Doc. # 213 at 133:23-136:1).

Dr. Simon claims that in the March 2010 presentation she objected to the DM diagnosis and stated: "I've never heard of this. I've never read about it. Disuse myopathy is not existent. Cannot use it." (Pl. Dep. Doc. # 210-1 at 211:14-24). Both Dr. Hume, who attended the same presentation, and

Billalobos testified that they did not hear Dr. Simon voice an objection to disuse myopathy. (Doc. # 213 at 90:13-92:22; Doc. # 221 at 72:12-19, 115:6-9).

After the presentation, Dr. DeJesus and Dr. Hume looked into the diagnosis for themselves and began using the diagnosis. (Doc. # 211 at 183:12-14, 184:19-185:4, 189:7-190:11; Doc. # 213 at 82:1-24, 88:20-89:14, 93:6-100:18).

Indeed, Dr. Simon admits that physiatrists can disagree over the appropriate diagnosis for a patient and that she and Dr. DeJesus had a difference of opinion on disuse myopathy. (Pl. Dep. Doc. # 210 at 67:25-68:3, 75:20-76:2; Pl. Dep. Doc. # 210-1 at 228:11-13, 233:23-234:1). When asked about a specific patient whom Dr. Hume had diagnosed with DM, among other things, Dr. Simon admitted that "[e]very physician could have a different opinion." (Pl. Dep. Doc. # 210-1 at 312:16-315:16; Doc. # 210-8 at Ex. 49).

One doctor associated with HealthSouth, Dr. Dexanne Clohan, noted in a May 2009 email to Billalobos and others that "there is a significant difference of opinion among the doctors about this diagnosis." (Doc. # 236-38 at Ex. 5). Yet, HealthSouth has produced the expert report of Dr. Randall Braddom, a rehabilitation physician with 51 years of practice, and former President of the American Academy of

Physical Medicine & Rehabilitation. Dr. Braddom opines that "Disuse Myopathy is Histologically and Clinically an Accurate and Appropriate Diagnosis." (Doc. # 209-2 at 3-5); see also (Doc. # 211 at 138:8-139:12, 140:10-24, 189:16-190:6; Doc. # 213 at 112:14-113:22).

When shown medical records she completed, Dr. Simon admitted that she diagnosed patients with disuse myopathy for months immediately following the March 2010 presentation. (Doc. # 210-7 at Ex. 27, 29-32, 34-36; Doc. # 210-8 at Ex. 37, 38; Pl. Dep. Doc. # 210-1 at 214:8-215:17, 218:14-222:22, 235:19-238:9, 243:18-248:17). For one of those patients, Dr. Simon discharged the patient on November 15, 2010, and signed the discharge summary on December 13, 2010, which included "disuse myopathy" under discharge diagnoses. (Doc. # 218 at 6 & Ex. K; Doc. # 210-8 at Ex. 38; Pl. Dep. Doc. # 210-1 at 247:20-248:6). Dr. Simon noted that she diagnosed a few patients with both DM and gait dysfunction, so she stated that she "billed [for] a gait dysfunction." (Pl. Dep. Doc. # 210-1 at 215:4-11, 220:20-22, 222:8-10). However, when asked, she admitted that she did not know what diagnoses HealthSouth Sarasota used to bill for those patients and did not recall seeing the bills. (Id. at 215:12-17, 221:3-6, 222:19-22). Dr. Simon testified that she used the diagnosis of DM "mostly

[because of] pressure" being put on her by certain people at the hospital. (Id. at 221:1-2, 222:23-223:1, 223:25-224:10).

Dr. Simon was not responsible for billing for hospital services, had no involvement in HealthSouth's coding or billing process, and did not see the bills. (Pl. Dep. Doc. # 210 at 125:25-126:4; Pl. Dep. Doc. # 210-1 at 207:10-14, 209:10-12, 290:23-291:1; Doc. # 211 at 71:16-20, 167:11-17; Doc. # 212-1 at 244:17-245:18, 247:14-248:8; Doc. # 215 at 49:13-51:1). Instead, HealthSouth's professional coders review patient records and assign a billing code that matches the diagnoses written in the records by the rehabilitation physician. (Doc. # 215 at 49:13-51:1; Doc. # 221 at 36:14-25, 47:6-25, 74:20-76:19, 106:15-24, 108:4-19, 172:14-173:22, 174:22-176:11; Doc. # 212-1 at 244:17-245:18).

Dr. Simon testified that she did not know who billed for HealthSouth, how HealthSouth billed for physical therapy or occupational therapy services, or how HealthSouth billed for patients diagnosed with DM. (Pl. Dep. Doc. # 210-1 at 207:10-14, 209:10-12, 290:23-291:1). Indeed, when asked what diagnosis code Defendants used to bill for the services provided to the patient discharged on November 15, 2010, Dr. Simon testified that she did not know. (Id. at 248:11-17).

However, Billalobos testified that the use of ICD-9 code 359.89 was appropriate for diagnoses of DM, as that code covers all myopathies not specified elsewhere. (Doc. # 221 at 75:1-76:19, 106:15-24, 174:22-176:11).

Also, Dr. Simon did not see bills to patient's therapy sessions and has never seen Dr. DeJesus' billing records. (Pl. Dep. Doc. # 210 at 125:25-126:4, 296:10-14). Dr. Simon testified that HealthSouth receives a lump sum payment for each patient based on length of stay, diagnosis and functional status. (Pl. Dep. Doc. # 210-1 at 208:25-209:9; Doc. # 212 at 15:11-24).

C.   **Reduction in Patients and Leaving HealthSouth**

On October 18, 2010, HealthSouth Sarasota's Director of Marketing, Nancy Arnold, sent Braz an email with the subject "Dr. Simon." (Doc. # 217-4 at Ex. 12). The email refers to implementing a "new process" for "the unassigned patient rotation," but does not specify what this new process would entail. (Id.). Braz emailed Arnold back, explaining that he was reviewing HealthSouth's policies and bylaws before implementing a new process. (Id.).

A few days later, it came to Braz's attention that Dr. Simon was behind on her progress notes. (Doc. # 212 at 119:7-13; Doc. # 218 at 3-4 & Ex. C; Pl. Dep. Doc. # 210 at 159:17-

11

160:1). Additionally, around this time, Dr. Simon completed a History and Physical ("H&P"), a documentation for an admission examination, for a patient who had not yet been admitted to HealthSouth Sarasota. (Doc. # 212 at Braz. Dep. at 85:12-88:2; Doc. # 218 at 2-3; Doc. # 210-5 at Ex. 16). Dr. Simon dictated the H&P even though she had not examined the patient. (Pl Dep. Doc. # 210 at 157:3-10, 166:16-167:11; Doc. # 210-5 at Ex. 20).

Braz discussed the H&P with Dr. Simon on October 28, 2010. (Doc. # 218 at 3 & Ex. B). The next day, Braz informed Dr. Bonnie Gabriel, president of the MEC, about Dr. Simon's completing the H&P. (Id. at 3 & Ex. B). Braz averred that he decided to stop assigning unassigned patients admitted to the hospital to Dr. Simon based on this conversation over the H&P incident. (Id. at 3). Braz informed Dr. Simon of this decision on November 1, 2010. (Doc. # 212-1 at 280:10-282:13; Doc. # 212-10 at Ex. 34).

In November 2010, the MEC began an investigation of Dr. Simon. In a written statement to the MEC, Dr. Simon wrote that the H&P incident was a mistake. (Doc. # 210-5 at Ex. 20). There are no other incidents of a doctor dictating an H&P without physically examining the patient first. (Doc. # 212 at 88:3-89:11; Doc. # 212-8 at Ex. 16).

Ultimately, the MEC determined that the H&P incident was an "isolated error" and instituted a six-month "informal collegial intervention" to ensure that Dr. Simon's documentation satisfied requirements. (Doc. # 212 at 122:21-123:7, 131:18-135:9; Doc. # 212-8 at Ex. 16-18; Doc. # 218 at 4-5 & Ex. G; Doc. # 210-6 at Ex. 23). A few months later in September 2011, Dr. DeJesus stopped using Dr. Simon as weekend coverage for his patients at HealthSouth Sarasota. (Doc. # 211-7 at Ex. 21; Doc. # 211 at 191:23-192:3).

Around February 29, 2012, Defendants terminated Dr. Simon's Program Medical Direction Services Agreement. (Doc. # 212-1 at 199:10-200:23; Doc. # 210-4 at Ex. 3; Pl. Dep. Doc. # 210 at 30:2-22, 176:9-177:6). The termination of the agreement did not "terminate [Dr. Simon's] medical staff membership or privileges at the hospital." (Doc. # 210-4 at Ex. 3). Braz testified he made the decision to terminate the agreement because Dr. Simon was not submitting hours related to her duties as Program Director and was not attending all of the meetings. (Doc. # 212-1 at 199:10-200:23).

On or about April 16, 2012, Dr. Simon left HealthSouth Sarasota on medical leave. (Doc. # 210-8 at Ex. 46; Pl. Dep. Doc. # 210-1 at 263:6-265:1). According to her declaration, when she went out on medical leave, Dr. Simon had "been

stripped of all but two of [her] patients, and could no longer earn a living working there." (Doc. # 236-7 at 2). Dr. Simon did not return to HealthSouth Sarasota once her leave was complete. (Pl. Dep. Doc. # 210-1 at 264:24-265:18).

### D.   **Procedural History**

Dr. Simon filed this FCA action under seal on February 3, 2012. (Doc. # 1). Five years later, Dr. Simon filed an Amended Complaint. (Doc. # 44). In April 2019, the United States of America elected not to intervene in the action, and the case was unsealed. (Doc. ## 60, 61).

Thereafter, the United States settled the underlying FCA claims against Defendants and filed a Stipulation regarding the settlement. (Doc. # 73). Then, on July 3, 2019, the Court dismissed the primary FCA claims with prejudice but retained jurisdiction "to resolve any claims from the Relator pursuant to [the FCA's retaliation provision], as well as any claims for attorney's fees and costs . . . and claims related to fraud on the State of Florida." (Doc. # 74).

The current complaint is the Third Amended Complaint, filed on January 10, 2020, by Dr. Simon and Florida Rehabilitation Associates, PLLC, "a Florida professional limited liability company which is wholly owned and operated by Dr. Simon." (Doc. # 148). The Third Amended Complaint

14

asserts retaliation claims under 31 U.S.C. § 3730(h), the FCA's retaliation provision, against Defendants. (Id.).

The case has proceeded through discovery and, now, the parties have cross-moved for summary judgment. (Doc. ## 209, 214). The Motions are fully briefed (Doc. ## 232, 233, 245, 247), and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing

15

the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only

16

proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984)("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

## III. **Analysis**

### A.   **Defendants' Motion**

The FCA serves as one of the primary vessels for combatting fraud against the federal government and federal programs. United States ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 809 (11th Cir. 2015). "Because employees naturally became a major source of information about fraud committed against the government, Congress amended the FCA in 1986 to

17

protect employees who investigate and report fraud from the retaliatory acts of their employers." Kalch v. Raytheon Tech. Servs. Co., LLC, No. 6:16-cv-1529-PGB-KRS, 2017 WL 3394240, at *3 (M.D. Fla. Aug. 8, 2017) (citing Arthurs v. Global TPA LLC, 208 F. Supp. 3d 1260, 1265 (M.D. Fla. 2015)). To that end, the FCA makes it illegal for an employer to retaliate against any employee, contractor, or agent for engaging in whistleblowing activities. Id. The FCA's anti-retaliation provision specifically states as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To establish a claim under Section 3730(h), a plaintiff must show: "(1) the employee engaged in conduct protected under the FCA; (2) the employer knew the employee was engaged in such conduct; and (3) the employer retaliated against the employee because of the protected conduct." David v. BayCare Health Sys., Inc., No. 8:19-cv-2136-TPB-JSS, 2019 WL 6842085,

at *4 (M.D. Fla. Dec. 16, 2019). HealthSouth argues that Dr. Simon has not satisfied any of the elements of the claim.[1]

### 1.   Protected conduct

Section 3730(h)(1) protects two types of conduct: (1) conduct in furtherance of FCA litigation; and (2) "other efforts" to stop violations of the FCA, "such as reporting suspected misconduct to internal supervisors." Halasa v. ITT Educ. Servs., Inc., 690 F.3d 844, 847-48 (7th Cir. 2012). "Under the first prong of that test, an employee's lawful acts are in 'furtherance of an action under this section' if she 'investigat[es] matters that reasonably could lead to,' or have a 'distinct possibility' of leading to, a 'viable False Claims Act case.'" Singletary v. Howard Univ., 939 F.3d 287, 295 (D.C. Cir. 2019)(citation omitted).

The second clause, added by Congress in 2009 to expand the scope of protected conduct, "unambiguously contemplates

---

[1] In its reply, HealthSouth argues that this Court should strike Plaintiffs' response to the statement of material facts for failure to comply with the Court's order regarding summary judgment motions (Doc. # 113) and deem HealthSouth's statement of material facts admitted. (Doc. # 247 at 2). The Court understands HealthSouth's frustration with the legal argument and other flaws contained in many of Plaintiffs' responses to HealthSouth's statement of material fact. Nevertheless, in the interest of resolving cases on the merits, the Court declines to strike Dr. Simon's response to the statement of material facts.

protecting conduct pursued outside the context of potential FCA litigation." <u>Arthurs</u>, 208 F. Supp. 3d at 1264-66. Therefore, it not only protects "whistleblowing conduct taken in furtherance of potential litigation, but also whistleblowing conduct taken to stop a possible violation of the FCA where no litigation is contemplated." <u>Id.</u>

Courts have held that a party claiming protection under the second clause must have had an objectively reasonable belief that an employer was engaged in violations of the FCA. <u>See</u> <u>Percell v. Yorktown Sys. Grp., Inc.</u>, No. 5:19-CV-11-LCB, 2020 WL 6807472, at *4-5 (N.D. Ala. Sept. 30, 2020)(citing <u>Carlson v. DynCorp Int'l LLC</u>, 657 F. App'x 168 (4th Cir. 2016)); <u>cf.</u> <u>Roberts v. Rayonier, Inc.</u>, 135 F. App'x. 351, 357 (11th Cir. 2005)(applying the "objectively reasonable" standard to a retaliation claim under the ADA).

"An organization might commit, and its employees might believe it has committed, any number of legal or ethical violations — but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of <u>the</u> <u>False</u> <u>Claims</u> <u>Act</u>, not just of general principles of ethics and fair dealing." <u>Hickman v. Spirit of Athens, Alabama, Inc.</u>, --- F.3d ---, No. 19-10945, 2021 WL 164322, at *5 (11th Cir. Jan. 19, 2021). "It is not enough

20

for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds. In order to file under the [FCA], whether in a qui tam or a retaliation action, an employee must suspect that her employer has made a false claim to the federal government." Id.

Therefore, Dr. Simon must not only show that she subjectively believed that HealthSouth was violating the FCA, but also that her belief was "objectively reasonable in light of the facts and record presented." Percell, 2020 WL 6807472, at *6.

As an initial matter, there is a genuine issue of material fact regarding whether Dr. Simon complained of any alleged fraud at all. Here, Dr. Simon's complaints were all verbal. According to her testimony, Dr. Simon objected to the use of the DM diagnosis during a presentation in March 2010. (Doc. # 236-7 at 2-3). She also asserts that she verbally complained about other allegedly false diagnoses and improper practices. (Id.).

HealthSouth highlights that there is no contemporaneous documentary evidence of these complaints and the people allegedly complained to do not remember these complaints. (Doc. # 209 at 14, 20-21). True, this evidence raises a credibility issue regarding Dr. Simon's sworn testimony. See

21

Anderson, 477 U.S. at 255 ("Credibility determinations . . .
are jury functions, not those of a judge, whether he is ruling
on a motion for summary judgment or for a directed verdict.").
But, at the summary judgment stage, the Court credits Dr.
Simon's testimony that she did, in fact, make complaints about
alleged fraud. Nevertheless, the Court concludes that Dr.
Simon's belief that the FCA was being violated was not
objectively reasonable.

Notably, Dr. Simon failed to respond to HealthSouth's
arguments about Dr. Simon's alleged complaints not related to
DM. Her response merely addresses the objective
reasonableness of Dr. Simon's belief that the DM diagnosis
and coding of it as a CMS-13 diagnosis was fraudulent. (Doc.
# 232 at 24-27). Therefore, Dr. Simon has abandoned the
argument that she had an objectively reasonable belief that
fraud was occurring based on conduct besides the use of the
DM diagnosis and the coding of that diagnosis. See Powell v.
Am. Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9
(S.D. Ala. 2014)("[W]here the non-moving party fails to
address a particular claim asserted in the summary judgment
motion but has responded to other claims made by the movant,
the district court may properly consider the non-movant's

default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

Thus, the Court need only address Dr. Simon's complaints about DM and its coding. Dr. Simon asserts that the use of the DM diagnosis and the use of the ICD code 359.89 for billing the government was improper. Yet, Dr. Simon was not responsible for billing for hospital services, had no involvement in HealthSouth's coding or billing process, and did not see the bills. (Pl. Dep. Doc. # 210 at 125:25-126:4; Pl. Dep. Doc. # 210-1 at 207:10-14, 209:10-12, 290:23-291:1; Doc. # 211 at 71:16-20, 167:11-17; Doc. # 212-1 at 244:17-245:18, 247:14-248:8; Doc. # 215 at 49:13-51:1). For example, when asked if she knew what ICD code HealthSouth used to bill for a patient Dr. Simon diagnosed with DM, Dr. Simon responded, "I do not." (Pl. Dep. Doc. # 210-1 at 220:20-221:6). Thus, Dr. Simon did not have any knowledge of what diagnoses HealthSouth relied on when billing the government for services provided to patients diagnosed with DM. Nor did she have any knowledge, at the time, that HealthSouth was billing the government using ICD code 359.89 for patients diagnosed with DM.

Regardless, even if Dr. Simon knew about the use of this ICD code, the record does not support that Dr. Simon could

believe this code's use was fraudulent given her lack of knowledge of coding. Also, Billalobos testified that the use of code 359.89 was appropriate for diagnoses of DM, as that code covers all myopathies not specified elsewhere. (Doc. # 221 at 75:1-76:19, 106:15-24, 174:22-176:11). Furthermore, IRFs like HealthSouth Sarasota take up to 40% of patients with non-CMS-13 conditions and the government often may not rely on ICD codes when determining presumptive compliance with the 60% Rule. (Doc. # 209-5 at 7); see also 42 CFR § 412.29(b)(1); 42 CFR § 412.622(a). Given this, Dr. Simon lacked an objectively reasonable belief that the use of the DM diagnosis impacted any payment for services.

Therefore, Dr. Simon had no knowledge from which she could reasonably believe that claims based on a diagnosis of DM or use of the ICD-9 code 359.89 were actually submitted to the government. See Elkharwily v. Mayo Holding Co., 84 F. Supp. 3d 917, 926 (D. Minn. 2015)(finding that the plaintiff had no reason to believe fraudulent claims were being submitted because he admitted he (1) was unaware what was ultimately billed to Medicare, (2) never saw the billing records for any patient, (3) did not know the billing codes were provided to the billing department, (4) did not know what billing codes were used to support charges submitted to

24

Medicare, (5) did not see the bills sent to Medicare for reimbursement, and (6) did not see what reimbursement the defendant received from Medicare), aff'd, 823 F.3d 462 (8th Cir. 2016).

Second, even if Dr. Simon had knowledge of how HealthSouth coded and billed for patients with DM, a reasonable difference in opinion between medical professionals does not create a "false claim" under the FCA. See United States v. AseraCare, Inc., 938 F.3d 1278, 1297 (11th Cir. 2019)("It follows that when a hospice provider submits a claim . . . 'based on the physician's or medical director's clinical judgment . . .,' the claim cannot be 'false' — and thus cannot trigger FCA liability — if the underlying clinical judgment does not reflect an objective falsehood."). Indeed, "[a] properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong." Id.

There is evidence, including Dr. Clohan's 2009 email and Dr. Braddom's expert report, that DM is a diagnosis over which some physicians have a difference of opinion.[2] (Doc. # 236-

---

[2] The Court is not considering the deposition testimony of Dr. Suzanne Groah and Jeffrey Ruskan, which were taken in a related case. Neither Dr. Groah nor Mr. Ruskan were disclosed as potential witnesses by Plaintiffs in their Rule 26

38 at Ex. 5; Doc. # 209-2 at 3-5). But this apparent disagreement among physicians does not establish that Dr. Simon reasonably believed HealthSouth was violating the FCA. There is no evidence that other doctors believed that the DM diagnosis was inappropriate for the patients they diagnosed with DM. See AseraCare, Inc., 938 F.3d at 1297 (explaining in the context of a false claims claim that "a plaintiff alleging that a patient was falsely certified for hospice care must identify facts and circumstances surrounding the patient's certification that are inconsistent with the proper exercise of a physician's clinical judgment"). Rather, Dr. DeJesus and Dr. Hume testified that they believe DM is a legitimate

---

disclosures in this case. See Fed. R. Civ. P. 37(c)(1)("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); see also Babadjide v. Betts, No. 6:17-cv-658-Orl-28TBS, 2019 WL 632020, at *4 (M.D. Fla. Feb. 14, 2019)(excluding expert report where expert had not been disclosed in the civil case, even though the expert had been disclosed in related criminal case), motion to certify appeal denied, No. 6:17-cv-658-Orl-28TBS, 2019 WL 10910807 (M.D. Fla. Apr. 11, 2019), and appeal dismissed, No. 19-10953-B, 2019 WL 2494704 (11th Cir. May 1, 2019). And the Court cannot conclude that the failure to disclose these witnesses was either harmless or substantially justified. See Bush v. Gulf Coast Elec. Co-op., No. 5:13-CV-369-RS-GRJ, 2015 WL 3422336, at *6 (N.D. Fla. May 27, 2015)("Where, as here, a party prepares its motion for summary judgment without knowledge of a potential witness, the failure to disclose the witnesses is not harmless.").

diagnosis. (Doc. # 211 at 184:19-185:4, 189:7-25; Doc. # 213 at 82:1-24, 88:20-89:14, 93:6-100:18).

Dr. Simon herself diagnosed a few patients with DM, among other things. Although she said she felt "pressure" to use the diagnosis, she stopped short of testifying that her use of the diagnosis was false and fraudulent. (Pl. Dep. Doc. # 210-1 at 221:1-2, 222:23-223:1, 214:8-215:17). Furthermore, Dr. Simon acknowledged that physicians can disagree over the appropriate diagnosis for a patient. (Id. at 228:11-13, 315:1-16).

Taking all the facts in the light most favorable to Dr. Simon, Dr. Simon lacked a reasonable basis to think that doctors were fraudulently relying on DM to admit patients, much less submitting false claims to the government based on that diagnosis. At most, there is evidence that Dr. Simon — and some other physicians — disagreed with the diagnosis of DM. But this disagreement does not render fraudulent any claims based on the DM diagnosis by other doctors who believed in DM. Thus, Plaintiffs did not engage in protected activity and summary judgment for Defendants is warranted.

### 2.   Other Elements

Because the Court has determined that Plaintiffs did not engage in protected activity, summary judgment in favor of

Defendants is proper and the Court need not address the other elements of the retaliation claim.

**B.**   <u>**Plaintiffs' Motion**</u>

As the Court has already determined that summary judgment in favor of HealthSouth on all counts is appropriate, the Court denies Plaintiffs' Partial Motion for Summary Judgment. (Doc. # 214).

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants Encompass Health Rehabilitation Hospital of Sarasota, LLC, HealthSouth Real Property Holdings, LLC, and HealthSouth Corporation's Motion for Summary Judgment (Doc. # 209) is **GRANTED.**

(2)  Plaintiffs Emese Simon and Florida Rehabilitation Associates, PLLC's Motion for Partial Summary Judgment (Doc. # 214) is **DENIED.**

(3)  The Clerk shall enter judgment accordingly and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>12th</u> day of February, 2021.

<u>VIRGINIA M. HERNANDEZ COVINGTON</u>
UNITED STATES DISTRICT JUDGE